John P. Barry
Allison L. Martin
PROSKAUER ROSE LLP
One Newark Center
Newark, New Jersey 07102
(t) (973) 274-3200
(f) (973) 274-3299

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DEBBY DeLUCA,                                    :
                                                 :              12-CIV-8239 (TPG)
                    Plaintiff,                   :
                                                 :
                                                 :
        against                                  :              **ECF CASE**
                                                 :
SIRIUS XM RADIO INC.,                            :              **ORAL ARGUMENT**
                                                 :                **REQUESTED**
                    Defendant.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

_____

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

_____

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................iii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF UNDISPUTED FACTS .........................................................................2

ARGUMENT .........................................................................................................................3

I.     THE GOVERNING STANDARD ON SUMMARY JUDGMENT ....................................3

II.    DeLUCA'S OVERTIME CLAIMS ARE BASELESS ........................................................5

     A.     DeLuca Is Properly Classified As An Exempt Creative
          Professional........................................................................................................3

     B.     DeLuca Is Also Properly Classified As An Exempt
          Administrative Employee .................................................................................5

III.   DeLUCA'S HOSTILE WORK ENVIRONMENT CLAIMS
      SHOULD BE DISMISSED. ..............................................................................................6

     A.     DeLuca's Gender-Based Hostile Work Enviroment Claim Is
          Based on A Single Isolated Event That Is Not Actionable..............................7

     B.     DeLuca's Sexual Orientation Hostile Work Environment
          Claim Has No Basis .........................................................................................8

       1.   The Alleged Incidents Are Untimely, Inadmissable Or
          Otherwise Substantively Deficient ...........................................................8

       2.   No Trier of Fact Could Reasonably Conclude That An
          Actionable Hostile Work Environment Exists..........................................10

IV.    DeLUCA'S EQUAL PAY CLAIMS SHOULD BE DISMISSED ....................................11

     A.     Plaintiff Has Not Satisfied Her Prima Facie Burden For
          Numerous Reasons...........................................................................................11

     B.     Any Compensation Differential Is Due To Factors Other
          Than Sex ..........................................................................................................13

     C.     DeLuca Cannot Recover Bonuses Or Equity Awards Under
          the NYLL .........................................................................................................15

V.      DeLUCA CANNOT ESTABLISH THE EXISTENCE OF A
        TRIABLE ISSUE OF FACT IN CONNECTION WITH HER
        CLAIMS OF GENDER AND SEXUAL ORIENTATION
        DISCRIMINATION .........................................................................................16

        A.      The Majority Of The Alleged Employment Actions Are Not
                Actionable ..................................................................................................17

        B.      Sirius Has Legitimate Non-Discriminatory Reasons For Its
                Decisions For That DeLuca Cannot Show Were Pretext For
                Gender Discrimination ...............................................................................18

        C.      Sirius Has Legitimate Non-Discriminatory Reasons For Its
                Decisions For That DeLuca Cannot Show Were Pretext For
                Sexual Orientation Discrimination .............................................................20

VI.     DeLUCA CANNOT ESTABLISH A TRIABLE ISSUE OF
        FACT ON HER RETALIATION CLAIMS ........................................................20

        A.      Most Of The Alleged Retaliatory Actions Are Not Adverse
                As A Matter of Law .....................................................................................21

        B.      DeLuca's Complaints Are Too Remote In Time To Yield
                An Inference of Causation ...........................................................................22

VII.    DeLUCA'S REQUESTS FOR IMPERMISSIBLE DAMAGES
        MUST BE DISMISSED .....................................................................................24

        A.      DeLuca Cannot Recover Liquidated Damages Under Both
                The NYLL And FLSA ..................................................................................24

        B.      DeLuca Is Not Entitled To Recover Punitive Damages On
                Her Claims Under Title VII And The NYCHRL ........................................25

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alfano v. Costello,*
   294 F.3d 365 (2d Cir. 2002)................................................................................6

*Altieri v. Albany Pub. Library,*
   172 F. App'x 331, 333-34 (2d Cir. 2006)............................................................23

*Augustin v. Yale Club of N.Y.C.,*
   No. 03-cv-1924, 2006 WL 2690289 (S.D.N.Y. Sept.15, 2006) ...........................10

*Beyer v. Cty. of Nassau,*
   524 F.3d 160 (2d Cir. 2008)..............................................................................21

*Big Apple Tire v. Telesector Res,*
   476 F.Supp.2d 314 (S.D.N.Y. 2007)....................................................................8

*Britt v. Merrill Lynch & Co., Inc.,*
   No. 08-cv-5356, 2011 WL 4000992 (S.D.N.Y. Aug. 26, 2011).....................11, 18

*Brown v. Snow,*
   2006 WL 623594 (S.D.N.Y Mar. 13, 2006) ..................................................17, 22

*Brown v. Coach Stores Inc.,*
   163 F.3d 706 (2d Cir. 1998)..............................................................................10

*Buckman v. Calyon Sec. (USA) Inc.,*
   817 F.Supp.2d 322 (S.D.N.Y. 2011)..................................................................16

*Bunis v. Runyon,*
   No. 94-cv-2063, 1997 WL 639241 (S.D.N.Y. Oct. 16, 1997)..............................18

*Campbell w. Cellco P'ship,*
   860 F.Supp.2d 284, 298 (S.D.N.Y. 2012)............................................................6

*Chepak v. N.Y.C. Health & Hosps. Corp.,*
   No. 11-cv-9698, 2015 WL 509279 (S.D.N.Y. Feb. 5, 2015) ...............................12

*Clark Cty. Sch. Dist. v. Breeden,*
   532 U.S. 268 (2001)..........................................................................................23

*Daniel v. T & M Protection Res. LLC,*
   87 F.Supp.3d 621, 634 (S.D.N.Y. 2015)........................................................10, 19

*DeLeonardis v. Credit Agricole Indosuez,*
No. 00-cv-0138, 2000 WL 1718543 (S.D.N.Y. Nov. 15, 2000)............................................16

*Dickens v. Hudson Sheraton Corp. LLC,*
No. 15-cv-2105, 2016 WL 825684 (S.D.N.Y. Mar. 1, 2016)...................................................9

*Epstein v. City of N.Y.,*
No. 06-cv-3788, 2009 WL 2431489 (S.D.N.Y. Aug. 6, 2009) (Griesa, J.).....................16, 17

*Evans v. Port Auth. of N.Y. & N.J.,*
192 F.Supp.2d 247 (S.D.N.Y. 2002)........................................................................................9

*Farias v. Instructional Sys., Inc.,*
259 F.3d 91 (2d Cir. 2001).....................................................................................................25

*Feingold v. N.Y.,*
366 F.3d 138 (2d Cir. 2004)...................................................................................................21

*Fenner v. News Corp.,*
No. 09-cv-09832, 2013 WL 6244156 (S.D.N.Y. Dec. 2, 2013)............................................10

*Freeman v. NBC, Inc.,*
80 F.3d 78 (2d Cir. 1996) ........................................................................................................4

*Fullwood v. Ass'n for the Help of Retarded Children,*
No. 08-cv-6739, 2010 WL 3910429 (S.D.N.Y. Sept. 28, 2010) .......................................7, 10

*Galabya v. N.Y.C. Bd. of Educ.,*
202 F.3d 636 (2d Cir. 2000)...................................................................................................18

*Gallo v. Prudential Residential Servs., L.P.,*
22 F.3d 1219 (2d Cir. 1994).....................................................................................................3

*ITC Ltd. v. Punchgini, Inc.,*
482 F.3d 135 (2d Cir. 2007).....................................................................................................3

*Jimenez v. Donahoe,*
968 F.Supp.2d 609 (S.D.N.Y. 2013).....................................................................................17

*Kerman-Mastour v. Fin. Indus. Reg. Auth., Inc.,*
814 F.Supp.2d 355 (S.D.N.Y. 2011).......................................................................................9

*Lee v. Winthrop Univ. Hosp.,*
No. 13-cv-5003, 2015 WL 7161955 (E.D.N.Y. Nov. 13, 2015) ...........................................10

*Lyle v. Warner Bros. Television Productions,*
132 P.3d 211 (Cal. 2006) .................................................................................................10, 22

*Matthews v. Corning Inc.*,
   77 F.Supp.3d 275, 293 (W.D.N.Y. 2014) ............................................................9

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ...........................................................................................16

*Melman v. Montefiore Med. Ctr.*,
   98 A.D.3d 107 (1st Dep't 2012) ...................................................................16, 17

*Moccio v. Cornell Univ.*,
   889 F.Supp.2d 539 (S.D.N.Y. 2012), *aff'd*,
   526 F. App'x 124 (2d Cir. 2013) ...................................................................11, 13

*Moore v. Kingsbrook Jewish Med. Ctr.*,
   No. 11-cv-3625, 2013 WL 3968748 (E.D.N.Y. July 30, 2013)...........................20

*Morales v. Mw Bronx, Inc.*,
   No. 15-cv-6296, 2016 WL 40844159 (S.D.N.Y. Aug. 1, 2016) (Griesa, J.) .........24

*Nassry v. St. Luke's Roosevelt Hosp.*,
   No. 13-cv-4719, 2016 WL 1274576 (S.D.N.Y. Mar. 31, 2016)...........................19

*Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*,
   752 F.Supp.2d 336 (S.D.N.Y. 2010)...................................................................19

*Nieblas-Love v. N.Y.C. Hous. Auth.*,
   No. 14-cv-5444, 2016 WL 796845 (S.D.N.Y. Feb. 26, 2016) .............................22

*O'Grady v. BlueCrest Cap. Mgmt. LLP*,
   No. 15-cv-2240, 2016 WL 1459673 (2d Cir. Apr. 14, 2016)...............................16

*Olorode v. Streamingedge, Inc.*,
   No. 11-cv-6934, 2014 WL 1689039 (S.D.N.Y. Apr. 29, 2014) ...........................24

*Orisek v. Am. Inst. of Aeronautics & Astronautics*,
   938 F.Supp. 185 (S.D.N.Y. 1996), *aff'd*,
   162 F.3d 1148 (2d Cir. 1998)...............................................................................15

*Ozawa v. Orsini Design Assocs., Inc.*,
   No. 13-cv-1282, 2015 WL 1055902 (S.D.N.Y. Mar. 11, 2015)...........................21

*Parker v. Arbor Ridge at Brookmeade, Inc.*,
   No. 14-cv-4202, 2016 WL 4257524 (S.D.N.Y. Aug. 10, 2016) (Griesa, J.)...........3

*Pollis v. New Sch. for Soc. Research*,
   132 F.3d 115 (2d Cir. 1997)..................................................................................11

*Rojas v. Roman Catholic Diocese of Rochester*,
   660 F.3d 98 (2d Cir. 2011)................................................................16

*Rowe v. Jagdamba, Inc.*,
   302 F. App'x 59 (2d Cir. 2008) .........................................................17

*Simmons v. Akin Gump Strauss Hauer & Feld, LLC*
   508 F. App'x 10 (2d Cir. 2013) .........................................................16

*Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*,
   915 F.Supp.2d 498 (S.D.N.Y. 2013)..................................................18

*Smalls v. Allstate Ins. Co.*,
   396 F.Supp.2d 364 (S.D.N.Y. 2005)..................................................22

*Smith v. Planas*,
   975 F. Supp. 303 (S.D.N.Y. 1997).....................................................20

*Sullivan v. N.Y.C. Dep't of Investigation*,
   No. 12-cv-2564, 2016 WL 676454 (S.D.N.Y. Feb. 17, 2016) (Griesa, J.)..................... passim

*Sun v. China 1221, Inc.*,
   No. 12-cv-7135, 2016 WL 1587242 (S.D.N.Y. Apr. 19, 2016) ............................................25

*Texas Dep't of Cmty. Affairs v. Burdine*,
   450 U.S. 248 (1981)...........................................................................17

*Tolbert v. Smith*,
   790 F.3d 427. 435 (2d Cir. 2015).......................................................17

*Tomizawa v. ADT LLC*,
   No. 13-cv-6366, 2015 WL 5772106 (E.D.N.Y. Sept. 29, 2015) ...........................................19

*Truelove v. Ne. Capital & Advisory, Inc.*,
   95 N.Y.2d 220 (2000) ........................................................................15

*Turner v. NYU Hosps. Ctr.*,
   784 F.Supp.2d 266 (S.D.N.Y. 2011), *aff'd*,
   470 F. App'x 20 (2d Cir. 2012) .........................................................20

*Uddin v. City of N.Y.*,
   427 F.Supp.2d 414 (S.D.N.Y. 2006)..................................................22

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
   133 S. Ct. 2517 (2013)........................................................................21

*Varughese v. Mount Sinai Med. Ctr.*,
   No. cv-8812 2015 WL 1499618 (Mar. 27, 2015).................................7, 15, 18, 22

*Venezia v. Luxoticca Retail N. Am.*,
  No. 13-cv-4467, 2015 WL 5692146 (S.D.N.Y. Sept. 28, 2015) ...........................................20

*Whitley v. Montefiore Med. Grp.*,
  No. 13-cv-4126, 2016 WL 1267788 (S.D.N.Y. Mar. 30, 2016)...........................................24

*Wilcox v. Cornell Univ.*,
  986 F.Supp.2d 281 (S.D.N.Y. 2013)................................................................ *passim*

*Williams v. N.Y.C. Hous. Auth.*,
  61 A.D.3d 62 (1st Dep't 2009) ....................................................................6, 9, 24

*Williams v. R.H. Donnelly, Corp.*,
  368 F.3d 123 (2d Cir. 2004)................................................................................18

*Wilson v. N.Y.P. Holdings*,
  No. 05-cv-10355, 2009 WL 873206 (S.D.N.Y. Mar. 31, 2009)........................................7, 10

## STATUTES

29 U.S.C. § 255 ...........................................................................................11

N.Y. Lab. Law § 198(3)...................................................................................11

N.Y. Lab. Law § 215 ......................................................................................21

## OTHER AUTHORITIES

29 C.F.R. § 541.200 ........................................................................................6

29 C.F.R. § 541.201 ........................................................................................6

29 C.F.R. § 541.300 ......................................................................................3, 4

29 C.F.R. § 541.302 ......................................................................................3, 4

29 C.F.R § 541.202(c)......................................................................................6

12 NYCRR § 142-2.14(c)(4)...........................................................................3, 4, 6

Fed. R. Civ. P. 56(a) .......................................................................................3

Fed. R. Evid. 801(d)(2)(D) .................................................................................9

Local Civil Rule 56.1 ......................................................................................2

## PRELIMINARY STATEMENT

Plaintiff Debby DeLuca asserts federal, state and city claims against her employer Defendant Sirius XM Radio Inc. ("Sirius") based on her gender and sexual orientation (including discrimination, hostile work environment, retaliation and unpaid overtime). The crux of her claims is that as one of Sirius' strongest imaging producers, she should have and would have been more highly compensated but for her gender and sexual orientation. The undisputed material facts conclusively demonstrate otherwise.

DeLuca was hired by Sirius in 2000 as an Assistant Imaging Producer in its Music Department with a $45,000 salary. In 2001, she was promoted to Imaging Producer, a position responsible for creating on-air content for Sirius' music channels, other than the songs themselves. DeLuca remains employed as an imaging producer today, currently making $83,560, which is close to the mid-point of salaries for all imaging producers. (*See* Declaration of John Barry ("Barry Decl.") Exs. 30-31.) The record conclusively demonstrates that compensation decisions were based on performance. That the Music Department's only other gay imaging producer is one of its most highly compensated demonstrates that sexual orientation did not play a role in determining compensation. As the Music Department's only female imaging producer, the material facts are that: (i) DeLuca's performance (including her lack of creativity) has consistently been mediocre at best, as reflected in feedback from her immediate boss, Vice Presidents, Programmers and the Department Head; (ii) Vice Presidents and programmers have asked not to work with DeLuca on channels or projects; (iii) numerous male imaging producers had lower salaries and bonuses than DeLuca; and (iv) there is nothing to suggest that the decision-maker ever said or did anything based on her gender.

DeLuca's remaining disparate treatment claims likewise should be dismissed as the workplace inconveniences complained of (*e.g.,* unfavorable assignments and shifts) are not

actionable. With respect to her sexual orientation hostile work environment claim, (i) there was only one comment allegedly directed at her related to her sexual orientation, it had context and was not repeated after DeLuca complained about it in 2011; (ii) her work on a celebrity roast had nothing to do with her sexual orientation, as the performance made "jokes" about religion, race, ethnicity, disabilities and nearly every other protected characteristic, not just sexual orientation; (iii) it is improperly based on hearsay; and (iv) the remaining allegations are trivial, isolated incidents. As to the gender hostile work environment claim, a single time-barred comment made in an email chain is too petty to be actionable and her boss leaving her a Wall Street Journal article about hysterectomies after she told him she needed the procedure is hardly nefarious.

As to her New York Labor Law ("NYLL") and Fair Labor Standards Act ("FLSA") claims, (i) they should be dismissed as DeLuca was exempt from overtime as a Creative Professional and Administrative Professional; and (ii) incentive compensation (such as bonuses and equity awards) are not "wages" under the NYLL. DeLuca's demand for liquidated damages under both statutes also should be stricken as this Court has made clear that overlapping liquidated damages are impermissible.

Finally, DeLuca's retaliation claims should be dismissed as they are based on petty slights and conspiratorial speculation that cannot even remotely establish causation. Sirius has employed DeLuca for 16 years and she alleges that she has complained about unequal pay at least once a year for the past 11 years. The specious allegation that Sirius waited years to retaliate against her should be dismissed.

## STATEMENT OF UNDISPUTED FACTS

The pertinent facts are set forth in the accompanying Statement of Undisputed Materials Facts Pursuant to Local Civil Rule 56.1 (hereinafter "56.1 Stmt."), which is incorporated herein by reference, including all defined terms.

## ARGUMENT

### I.     The Governing Standard On Summary Judgment

Fed. R. Civ. P. 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden to demonstrate that there is no genuine issue of material fact, *i.e.*, that taking the record as a whole a reasonable trier of fact could not find for the non-moving party. *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir. 1994). To survive summary judgment, plaintiff "must establish a genuine issue of fact by 'citing to particular parts of materials in the record.'" *Sullivan v. N.Y.C. Dep't of Investigation*, No. 12-cv-2564, 2016 WL 676454, at *4 (S.D.N.Y. Feb. 17, 2016) (Griesa, J.) (quoting Fed. R. Civ. P. 56(c)(1)). "Only disputes over 'facts that might affect the outcome of the suit under governing law' will preclude a grant of summary judgment." *Parker v. Arbor Ridge at Brookmeade, Inc.*, No. 14-cv-4202, 2016 WL 4257524, at *2 (S.D.N.Y. Aug. 10, 2016) (Griesa, J.) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986)). Conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment. *See, e.g., ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 151 (2d Cir. 2007).

### II.     DeLuca's Overtime Claims Are Baseless

#### A.     DeLuca Is Properly Classified As An Exempt Creative Professional

Under the FLSA and the NYLL, exempt professional employees are not entitled to overtime compensation. *See* 29 C.F.R. § 541.300; 12 NYCRR § 142-2.14(c)(4)(iii). DeLuca is and at all times was properly classified as an exempt creative professional. 29 C.F.R. § 541.302; 12 NYCRR § 142-2.14(c)(4)(iii). The creative professional exemption applies to any employee who is (1) "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week"; and (2) "[w]hose primary duty is the performance of work…requiring invention, imagination,

3

originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.300. *See also* 12 NYCRR § 142-2.14(c)(4)(iii). The musical field generally is a "recognized field[s] of artistic or creative endeavor," and musicians, composers, and conductors are exempt as creative professionals. 29 CFR § 541.302 (b). Television news writers, editors and producers also fall within the exemption. *See Freeman v. NBC, Inc.*, 80 F.3d 78 (2d Cir. 1996).

The first prong of the creative exemption is satisfied as DeLuca's annual salary of $81,060.30 (or approximately $1,558.00 per week) exceeds $455 per week. (Barry Decl. Ex. 29 at SIRIUS XM 0125853.) The second prong is likewise easily satisfied. DeLuca admits that her job is to "to *create* sounds and audio" that air on Sirius' music channels and that creativity plays a role in her work. (Am. Compl. ¶ 42; DeLuca Tr. 109:2-5.) An imaging producer's job is "to create [a] story" for the audience using different audio elements and techniques. (DeLuca Tr. 109:8-11.) Imaging producers work with voice talent to get "the right delivery" with the "right level of enthusiasm for that channel," and then surround the "voiceover with the proper music and effects" and use "pauses as a tool to help draw the audience in," all while still making sure to vary the different elements and techniques used from one piece to the next. (Blatter Tr. 86:10-87:9.) Imaging production is like "taking what starts out as a black and white picture and making it sound like it's in color." (*Id.* at 87:11-14.)

Imaging producers are expected to play a key role in the conception of production. (Barry Decl. Ex. 15.) Imaging producers suggest revisions or improvements to copy as part of the creative process and independently devise their own ideas for pieces. (Blatter Aff. ¶ 10.) DeLuca repeatedly testified about the collaborative nature of her work, explaining her working

relationship with programmers[1] as "kind of like bouncing ideas off each other." (DeLuca Tr. 171:2-3.) Producers also are expected to exercise creativity with respect to which techniques, effects, songs, and other audio elements accompany the voice component. (Blatter Aff. ¶ 11.)

Imaging producers also exercise tremendous creative discretion with respect to the *manner* in which they perform their job duties. DeLuca testified that the process for creating imaging is "a subjective thing" that depends on "the genre of music and what works better for [each producer.]" (DeLuca Tr. 85:9-15.) Producers are free to use varying techniques and to "just do things differently." (*Id.* at 90:14-91:16.) DeLuca testified that she has "a library of over 7,000 sound effects [and] music beds" that she draws upon in creating her production. (*Id.* at 46:2-4.)

At her deposition, DeLuca provided several examples of her work on different channels, which further underscores the creative nature of the imaging producer role:

- On the Christian channel, DeLuca independently suggested that she try to "beat-mix" the imaging, a process by which she would take the channel's voice, do "some weird things to it," and "put it to music." (*Id.* at 110:5-111:17.) DeLuca explained that by "messing with [the voice talent's] words," she was able to create something "almost like a song." (*Id.* at 111:13-17.) Now, she creates "beat mixes" for this channel "on a regular basis." (*Id.* at 110:11; 110:17.)

- On the channel "BPM," DeLuca "created different songs using the words 'BPM' or, before it was BPM, 'The Beat,' and "incorporated them into actual songs that were being played on the channel." (*Id.* at 174:4-14.)

- On the channel "The Groove," DeLuca testified that she would sometimes write the imaging pieces or "create pieces without using [the programmer's] script." (*Id.* at 189:3-10.) She also devised and wrote a series for The Groove with different pieces using "isms" or "catch phrases" "from that genre." (*Id.* at 189:11-15.)

**B.    DeLuca Is Also Properly Classified As An Exempt Administrative Employee**

An individual qualifies for the administrative professional exemption if (1) she earns more than $455 per week, (2) her primary duty is performing non-manual work directly related

---

[1] At Sirius, each channel typically has an assigned imaging producer and programmer. (Blatter Aff. ¶ 7.) "Programmers" are responsible for selecting the songs that are aired on their respective channel and also collaborate with imaging producers on all other on-air components. (*Id.*)

to the "general business operations of the employer," and (3) her work "includes the exercise of discretion and independent judgment with respect to matters of significance."[2] 29 C.F.R. § 541.200. *See also* 12 NYCRR § 142-2.14(c)(4)(ii). For many of the same reasons discussed in connection with the creative exemption, DeLuca qualifies for the administrative exception. First, her salary exceeds the weekly minimum. (Barry Decl. Ex. 29 at SIRIUS XM 0125853.) Second, her work falls squarely within Sirius' marketing and advertising efforts. (DeLuca Tr. 37:6-14; 37:15-38:15; Blatter Tr. 141:8-13.) Finally, DeLuca has significant discretion and creative freedom with respect to how she carries out her job responsibilities. (*See supra* pp. 4-5.)

## III.    DeLuca's Hostile Work Environment Claims Should Be Dismissed

Under Title VII and the New York State Human Rights Law ("NYSHRL"), DeLuca must show that the alleged conduct was "sufficiently severe or pervasive to alter the conditions of the [her] employment and create an abusive working environment." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (citation omitted). Courts consider a variety of factors to determine whether an environment is hostile, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Sullivan*, 2016 WL 676454, at *9 (Griesa, J.) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). While the standard is more liberal under the New York City Human Rights Law ("NYCHRL"), the local law is not a "general civility code." *Campbell w. Cellco P'ship*, 860 F.Supp.2d 284, 298 (S.D.N.Y. 2012). *See also Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 80 (1st Dep't 2009)

---

[2] Work is deemed "related to the general business operations" if it is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). This specifically includes work related to marketing and advertising. *Id.* § 541.201(b). An employee can still be considered to exercise discretion and independent judgment even if her decisions and recommendations are reviewed by her superiors. *Id.* § 541.202(c).

(summary judgment is appropriate where the alleged discriminatory conduct "could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences"). Even when accepting all allegations as true, DeLuca fails to identify conduct that would amount to a hostile work environment (based on gender or sexual orientation) under any of the applicable standards.

### A.  DeLuca's Gender-Based Hostile Work Environment Claim Is Based On A Single Isolated Event That Is Not Actionable

After over 15 years of work at Sirius, DeLuca identifies only a single incident that even ostensibly relates to gender: in August 2009, she was included in an email chain where one email made passing reference to a "Beef & Boobs joint." (Am. Compl. ¶ 263.) This isolated incident, which occurred more than three years before the filing of the Complaint, is untimely and also far too trivial to create a hostile work environment under federal, state or local law. *See Sullivan*, 2016 WL 676454 at *9 (Griesa, J.) (stray remarks that may be tasteless and impolite, but not physically threatening, do not create a hostile work environment); *Fullwood v. Ass'n for the Help of Retarded Children*, No. 08-cv-6739, 2010 WL 3910429 at *2-3, 8-9 (S.D.N.Y. Sept. 28, 2010) (granting summary judgment under NYCHRL despite comments like: "black people don't have great attitudes," "where is she at, out in the cotton fields?" "see, I had to sit on the back of the bus too," "what if one of your cousins gets a hold of your badge? They will have free access to the building"); *Varughese v. Mount Sinai Med. Ctr.,* No. cv-8812 2015 WL 1499618, at *58-64 (Mar. 27, 2015) (summary judgment under NYCHRL granted despite remarks about plaintiff's ethnicity/national origin); *Wilson v. N.Y.P. Holdings*, No. 05-cv-10355, 2009 WL 873206, at *28-29 (S.D.N.Y. Mar. 31, 2009) (NYCHRL gender and racial harassment claims dismissed despite comments/incidents including: "training females is like 'training dogs'"; "women need to be horsewhipped"; a reference to black female celebrities as "whores" and "sluts"; and

7

addressing female employees as "girls"); *Big Apple Tire v. Telesector Res*, 476 F.Supp.2d 314, 327 & n.118 (S.D.N.Y. 2007) (citing cases with multiple slurs);

To the extent DeLuca maintains that she was also subject to a hostile work environment when Todd left her a Wall Street Journal article about hysterectomies after she disclosed she needed the procedure (Am. Compl. ¶¶ 118, 121, 123), this claim can be easily rejected. It strains credulity to suggest that a newspaper article about alternatives to a medical procedure could be harassing under any circumstances. Moreover, the record shows that (i) DeLuca volunteered personal details about her medical condition to Todd, including that she named the tumor "Fabiola"; and (ii) DeLuca repeatedly referenced her hysterectomy on Facebook, where she was friends with co-workers. (Todd Tr. 108:12-18; Barry Decl. Ex. 34; DeLuca Tr. 21:13-22:19.)

### B. DeLuca's Sexual Orientation Hostile Work Environment Claim Has No Basis

Over a period of 15 years, DeLuca alleges only one remark made towards her and four incidents involving comments purportedly directed at other people/things to support her claim that she was subject to a hostile work environment due to her sexual orientation.

#### 1. The Alleged Incidents Are Untimely, Inadmissible Or Otherwise Substantively Deficient

DeLuca improperly attempts to string together a hostile work environment claim by relying on allegations that are outside the statute of limitations, are inadmissible hearsay, or are otherwise nothing more than petty slights.

DeLuca first alleges that in "spring of 2009," while engaged in idle chatter about a sports game over the weekend, DeLuca mentioned that she did not like sports, to which Mitch Todd responded "what kind of dyke are you?"[3] (DeLuca Tr. 198:4-16; Am. Compl. ¶¶ 88-92.) This comment falls outside the applicable three-year statute of limitations. Although under some

---

[3] Todd denies this incident. (Todd Tr. 97:4-8.) Moreover, DeLuca admits that Todd subsequently apologized to her and that he never made comment again. (DeLuca Tr. 202:17-203:6.)

circumstances a plaintiff may be permitted to rely on untimely incidents as part of an ongoing pattern of hostility, the continuing violations doctrine is inapplicable here because DeLuca has not alleged any actionable incidents of harassment within the limitations period. *Williams*, 61 A.D.3d at 79; *Dickens v. Hudson Sheraton Corp. LLC*, No. 15-cv-2105, 2016 WL 825684, at *11-12 (S.D.N.Y. Mar. 1, 2016).

DeLuca also cannot rely on a co-worker's representation that Todd referred to his boss as a "fag" (Am. Compl. ¶ 130) to create an issue of fact because this alleged comment is inadmissible hearsay and, as such, is not entitled to consideration on summary judgment. *Kerman-Mastour v. Fin. Indus. Reg. Auth., Inc.*, 814 F.Supp.2d 355, 369 (S.D.N.Y. 2011). *See also Evans v. Port Auth. of N.Y. & N.J.*, 192 F.Supp.2d 247, 262-64 (S.D.N.Y. 2002) (holding that coworker's statement relaying allegedly discriminatory remarks made by a supervisor do not fall within the hearsay exception of Fed.R.Evid. 801(d)(2)(D)).

DeLuca's remaining allegations are nothing more than isolated and stray incidents, which are not actionable. *Matthews v. Corning Inc.*, 77 F.Supp.3d 275, 293 (W.D.N.Y. 2014) (sporadic comments insufficient to create a hostile environment). Examples include: a comment in 2009 about a Vice President possibly having a "sex change" operation[4]; a reference to a "jingle" DeLuca was producing as "gay"; and an isolated assignment to work on a comedic performance that involved jokes about an array of protected characteristics, including sexual orientation, in 2012[5]. (Am. Compl. ¶¶ 104; 110; 195.) Even accepting the veracity of these allegations, such

---

[4] DeLuca suggests that she believed the alleged comment was made because of the Vice President's sexual orientation, but there is no evidence in the record to support this specious theory. On its face, the stray remark concerns only the subject's gender identity, which is wholly distinct from sexual orientation, and is no more objectively "offensive" to an individual who is homosexual than to one who is heterosexual.

[5] The performance, which was over two hours long, featured jokes about religion, ethnicity, disabilities, appearance, heterosexual sexual activity and personal affronts aimed at the celebrity guests. (DeLuca Tr. 300:7-10; Barry Decl. Ex. 37.) Moreover, it cannot be disputed that Sirius' business is entertainment, which includes broadcasting an array of programming spanning from adult comedy to LGBT interests. (Blatter Aff. ¶¶ 3, 5.) As to be expected with Sirius' open platform, other producers have also worked on material that could be considered offensive in a different

isolated and trivial incidents do not create a hostile work environment. *See e.g. Augustin v. Yale Club of N.Y.C.,* No. 03-cv-1924, 2006 WL 2690289, at *22 (S.D.N.Y. Sept.15, 2006).

2. *No Trier Of Fact Could Reasonably Conclude That An Actionable Hostile Work Environment Exists*

Even assuming that the alleged incidents are timely and otherwise admissible, courts have routinely rejected harassment claims despite much more egregious and pervasive incidents than the ones alleged here. For example, in *Daniel v. T & M Protection Res. LLC,* 87 F.Supp.3d 621, 634 (S.D.N.Y. 2015), the court granted summary judgment where a supervisor allegedly called plaintiff a "homo" and "fucking nigger," in addition to touching him sexually in one instance and making several other comments about his race and sexual orientation. *See also Wilson,* 2009 WL 873206 at *28-29 ; *Lee v. Winthrop Univ. Hosp.*, No. 13-cv-5003, 2015 WL 7161955, at *19 (E.D.N.Y. Nov. 13, 2015) (allegations that superiors called plaintiff, *inter alia,* a "faggot" and "black son" insufficient to state a hostile work environment claim); *Brown v. Coach Stores Inc.,* 163 F.3d 706, 708, 713 (2d Cir. 1998) (dismissing hostile work environment claim where supervisor told plaintiff she was "black like a real nigger," and made other comments about minorities); *Fullwood*, 2010 WL 3910429 at *2-3, 8-9 (granting summary judgment under NYCHRL despite multiple comments regarding race); *Fenner v. News Corp.,* No. 09-cv-09832 2013 WL 6244156 at *14 (S.D.N.Y. Dec. 2, 2013) (summary judgment granted under NYCHRL).

Here, it is also significant that none of the alleged incidents involved physical contact or were physically threatening. *See Sullivan*, 2016 WL 676454, at *9 (Griesa, J.) Moreover,

---

type of work environment. (Todd Aff. ¶ 7.) For example, other imaging producers have produced segments with titles such as "Osama Bin Laden Loved Porno" and "Dude Am I a Slut?" (*Id.*) Under such circumstances, there is no evidence that DeLuca was "singled out" to work on the roast; rather, such a task is a natural consequence of working in the uncensored entertainment industry. *See Lyle v. Warner Bros. Television. Productions,* 132 P.3d 211 (Cal. 2006) (assistant for the television show *Friends* did not have a triable hostile work environment claim where the offensive language was part of the creative dialogue involved in producing the show).

DeLuca only alleges that a single comment was made towards her; the remainder of the allegations concerned other people or, in one instance, the sound of a piece of imaging. *See Britt v. Merrill Lynch & Co., Inc.*, No. 08-cv-5356, 2011 WL 4000992, at *13 (S.D.N.Y. Aug. 26, 2011) (granting summary judgment under the federal, state and local laws, noting that the majority of the allegations were directed at or about people other than plaintiff). Thus, DeLuca's allegations necessarily fail to establish a claim for hostile work environment.

**IV.   DeLuca's Equal Pay Claims Should Be Dismissed**

To prove a claim under the Equal Pay Act ("EPA") or New York Equal Pay Act ("NYEPA"), "a plaintiff must show that: i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Moccio v. Cornell Univ.*, 889 F.Supp.2d 539, 569 (S.D.N.Y. 2012), *aff'd,* 526 F. App'x 124 (2d Cir. 2013). (internal citation omitted). If the plaintiff is able to make a *prima facie* showing, the burden shifts to the employer to prove that the "differential is based on any other factor other than sex." *Id.* at 570 (citing 29 U.S.C. § 206(d)(1)).[6]

**A.   Plaintiff Has Not Satisfied Her *Prima Facie* Burden For Numerous Reasons**

First, DeLuca identifies five individuals whom she believes are the proper comparators for purposes of calculating her damages—specifically, Tom Yankowski, AJ Allen Dexter, Jerry Rohira, Sean Johnson and Brian Apple. (Barry Decl. Ex. 9 at 22.) But there is no evidence in the record demonstrating that each of these individuals performs or performed equal work in jobs that require "equal skill, effort, and responsibility" and which are performed under similar

---

[6] Even assuming liability, the NYEPA statute of limitations precludes any recovery prior to November 13, 2006. N.Y. Lab. Law § 198(3). Under the FLSA, damages are not recoverable prior to November 13, 2010 since there is no evidence of willfulness. 29 U.S.C. § 255. *See also Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 118-19 (2d Cir. 1997).

working conditions as DeLuca's job. *See Chepak v. N.Y.C. Health & Hosps. Corp.,* No. 11-cv-9698, 2015 WL 509279, at *12 (S.D.N.Y. Feb. 5, 2015) (plaintiff's assertion that comparators held substantially equal positions insufficient to raise triable issue of fact.)

Second, DeLuca cannot prove that Dexter and Rohira are proper comparators during the periods in which each was employed as Creative Director.[7] The Creative Director position requires greater skill, effort and responsibilities than that of an imaging producer, a distinction that is apparent from each position's job description. (*Compare* Barry Decl. Ex. 15 *with* Ex. 16.) *See Chepak,* 2015 WL 509279, at *8 ("job descriptions are evidence—'often exceedingly good evidence'—of actual job content" for purposes of determining whether positions are substantially equal under the EPA.) Imaging producers are typically assigned to four or five music channels and are responsible for the conception, production and implementation of the imaging on those channels. (Blatter 30(b)(6) Tr. 66:25-67:4; Barry Decl. Ex. 15.) In contrast, a Creative Director: (i) leads high-profile Company initiatives on a number of different channels, such as the sonic "re-imaging" or "re-brand[ing] of a station; (ii) serves as the lead copy developer on special projects; (iii) heads specialty initiatives for Sirius' music, sports and talk programming; and (iv) coaches imaging producers on improving their technical and creative techniques. (Barry Decl. Exs. 16-18; Blatter Tr. 139:8-18; 137:17-138:8; Blatter 30(b)(6) Tr. 66:8-21; 66:25-67:7.) DeLuca herself has attended several training sessions with Dexter. (*See* Barry Decl. Ex. 19.)

Third, DeLuca disingenuously excludes Imaging Producers who are paid less than she is from her comparison group. When the compensation of all imaging producers is properly considered, the data shows that DeLuca's salary was right around the median, meaning there are

---

[7] Rohira was the Creative Director from November 4, 2010 through his resignation in June 2011, and Dexter has been a Creative Director since June 5, 2011 to the present. (Barry Decl. Ex. 29 at SIRIUS XM 0125971 & 0125981.)

male producers who earn both more *and less* than DeLuca. (Barry Decl. Ex. 31.) Further, in many years, more male imaging producers earned *less* than DeLuca in total compensation (*i.e.,* salary and bonus) than the number of male producers who received more in total compensation than she did. (Barry Decl. Ex. 30.) For these years, she simply cannot state a *prima facie* case of unequal pay. *Moccio,* 889 F.Supp.2d at 571 (holding equal pay claim "fails for the alternative reason that just as many male SEAs earned a lower salary as Moccio as earned a higher one").

### B.    Any Compensation Differential Is Due To Factors Other Than Sex

Summary judgment is also warranted because any difference in compensation is due to *bona fide* factors other than sex—most significantly, performance (which includes creative and technical skills). Steven Blatter (Senior Vice President and General Manager, Music Programming), makes all decisions about imaging producer compensation on the basis of performance. (*See e.g.,* Blatter Tr. 5:24-6:12: 6:16-21; 187:4-6.) Blatter asses17ses the individual's creative and technical skills first and foremost, with productivity, efficiency and interpersonal skills as secondary considerations. (*Id.* at 14:19-23; 23:4-7.) Blatter evaluates producers throughout the year by regularly listening to music channel imaging, as well as having an ongoing dialogue with the music "programming heads and at times individual programmers, who would then give [him] their feedback and input on the imaging that's being created for the channels they're responsible for." (*Id.* at 56:13-18; 20:20-21:3; 22:23-23:22.) Blatter also engages his direct reports and Human Resources in a discussion about employee compensation. (*Id.* at 10:7-18.) Based on these conversations and his own observations, Blatter considers each imaging producer's current salary, determines whether his or her performance has warranted an increase from the current level and, if so, how much of an increase is warranted based on performance. (*Id.* at 10:19-25; 14:24-15:11; *see also id.* at 144:17-145:11.) In this manner and using the aforementioned criteria, Blatter determined that DeLuca's performance has not

warranted any more compensation than what she has received in any given year.[8] (Blatter Aff. ¶¶ 18-19.)

DeLuca's performance deficiencies have persisted for over a decade. For instance: (1) Blatter has discussed DeLuca's lack of creative and technical growth with Todd since about 2005 or 2006; (2) about five to eight years ago, Blatter spoke with Darrin Smith (a Vice President) about DeLuca's production for "The Strobe," a disco channel, where her work was "very one dimensional in its sound and really lacked any real flare to it for such an upbeat type radio station"; and (3) more recently, Blatter listened to 20 or 30 pieces of imaging that DeLuca prepared for "The Groove," which he evaluated again as "sounding fairly one dimension from a creative standpoint and a technical perspective as well." (Blatter Tr. 166:12-167:9; 158:23-159:10; 76:2-17.) Todd, Rob Cross, Smith, and many others have also expressed similar sentiments about her work. (*See e.g.*, *id.* at 153:9-15; 156:23-157:4; Todd Tr. 178:15-22; 195:10-18; Barry Decl. Ex. 19.)

DeLuca's superiors expressed their concerns to her on numerous occasions. For example, DeLuca admitted during her deposition that Dion Summer (a Sirius Vice President) and BK Kirkland (a programmer) spoke to her about her unsatisfactory performance on "The Groove" in May 2013, testifying that Summers told her during this meeting "***we don't like the way you sound. We want a new producer***." (DeLuca Tr. 191:9-23; 193:8-10.) Eventually, Summers asked to have a different imaging producer replace DeLuca on "The Groove" because of ongoing problems with her "sub-par imaging quality" and the "lack of creativity" in her pieces. (Barry

---

[8] In contrast, other producers have received additional compensation when warranted by performance. (Blatter Aff. ¶ 17; Barry Decl. Ex. 30.) Moreover, the evidence clearly demonstrates that DeLuca was in no way "singled out" with respect to her compensation because there have also been male imaging producers who have not received compensation increases bonuses and/or equity awards. (Barry Decl. Ex. 30.) By way of one example only, Sean Johnson did not receive a single merit increase from 2006 until 2015. (Barry Decl. Ex. 30 125852.)

Dec. Ex. 26.) DeLuca also admitted that on another occasion, Summers told her that he did not want her work produced for "The Heat" channel and he wanted a different imaging producer "to do it because it would 'move' better." (Barry Decl. Ex. 23 at P0744.) Kid Kelly, one of the highest ranking and most sophisticated programmers, has requested not to work with DeLuca on his high-profile channels. (Blatter Aff. ¶ 20.) DeLuca's performance reviews have also repeatedly directed her to work on her creativity, among other areas. (Barry Decl. Ex. 24.)

Despite DeLuca's acknowledgment of criticisms, she maintains that her performance is adequate, testifying that "I'm not saying that I'm the best, but I'm definitely not as bad as they're making me out to be." (DeLuca Tr. 76:2-4.) DeLuca's "own disagreement with [her] employer's perceptions of [her] job performance does not satisfy [her] burden of showing that the [employer's] proffered justification was a pretext for discrimination." *Orisek v. Am. Inst. of Aeronautics & Astronautics*, 938 F.Supp. 185, 191 (S.D.N.Y. 1996), *aff'd*, 162 F.3d 1148 (2d Cir. 1998); *see also Wilcox v. Cornell Univ.*, 986 F.Supp.2d 281, 287 (S.D.N.Y. 2013) (the Court is not "a super-personnel department that reexamines an entity's business decisions").

Beyond summarily asserting her belief that she is compensated less because of her gender, DeLuca does not identify any evidence to prove that the legitimate, non-discriminatory factor Sirius considers in making compensation decisions—performance—is pretext for gender discrimination. *See Varughese*, 2015 WL 1499618, at *42 (to prove pretext, plaintiff must do more than say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class.") (citations omitted).

### C.   DeLuca Cannot Recover Bonuses Or Equity Awards Under The NYLL

As Sirius' bonus awards and equity-based compensation grants are discretionary and performance-based. As a result, they are excluded from the definition of "wages" under the NYLL and cannot support her NYEPA claim. *See Truelove v. Ne. Capital & Advisory, Inc.*, 95

N.Y.2d 220, 224-25 (2000) (employee's bonus, or lack thereof, did not qualify as "wages" under the NYLL). Under the NYLL, whether a bonus constitutes "wages" hinges on "whether the compensation is vested and mandatory as opposed to discretionary and forfeitable." *Buckman v. Calyon Sec. (USA) Inc.*, 817 F.Supp.2d 322, 335 (S.D.N.Y. 2011) (quotations omitted). If a wage is "entirely discretionary" and subject to the employer's "non-reviewable determination," it is not a wage under the Labor Law. *Id. See also O'Grady v. BlueCrest Cap. Mgmt. LLP*, No. 15-cv-2240, 2016 WL 1459673, at *1 (2d Cir. Apr. 14, 2016) (summary order). Indeed, "[r]eceipt of a fixed salary generally negates any inference that a separate incentive payment or purely discretionary bonus constitutes wages." *DeLeonardis v. Credit Agricole Indosuez*, No. 00-cv-0138, 2000 WL 1718543, at *11 (S.D.N.Y. Nov. 15, 2000). Here, DeLuca had a fixed salary *in addition* to the possibility of receiving separate and distinct bonuses and equity-based grants. They are neither vested nor mandatory payments Sirius is obligated to pay to DeLuca. (*See* Blatter Tr. 187:4-6; 145:4-11.) Accordingly, DeLuca's claims regarding any bonuses or equity awards under the NYLL should be dismissed.

## V.   DeLuca Cannot Establish The Existence Of A Triable Issue Of Fact In Connection With Her Claims of Gender And Sexual Orientation Discrimination

DeLuca's claims of gender and sexual orientation discrimination are analyzed under the burden-shifting approach established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[9] *See also Epstein v. City of N.Y.*, No. 06-cv-3788, 2009 WL 2431489, at *3-4 (S.D.N.Y.

---

[9] DeLuca asserts a claim for disparate treatment on the basis of gender under Title VII, NYSHRL, and NYCHRL, whereas her sexual orientation claim is only brought under the latter two statutes. "[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 n. 10 (2d Cir. 2011) (citation omitted). In addition to being assessed under the *McDonnell Douglas* framework, NYCHRL claims may also be analyzed under "the somewhat different 'mixed-motive' framework recognized in certain federal cases." *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 113 (1st Dep't 2012). To survive summary judgment under the mixed-motive framework, a plaintiff must present evidence from which a trier of fact could find that discrimination was a motivating factor for the challenged action. *Id.* at 128, 140; *see also Simmons v. Akin Gump Strauss Hauer & Feld*, LLC, 508 F. App'x 10, 13-14 (2d Cir. 2013). The law is clear, however, that "meeting the minimal requirements of a *prima facie*

Aug. 6, 2009) (Griesa, J.). DeLuca has the initial burden of showing "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Tolbert v. Smith*, 790 F.3d 427. 435 (2d Cir. 2015). If DeLuca satisfies this burden, it shifts to the employer to proffer a "legitimate, non-discriminatory" reason for the purportedly adverse employment action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "If the employer satisfies this requirement, the burden shifts back to the plaintiff to provide evidence that the employer's proffered reasons were pretextual." *Rowe v. Jagdamba, Inc.*, 302 F. App'x 59, 61 (2d Cir. 2008).

**A.   The Majority Of The Alleged Employment Actions Are Not Actionable**

Aside from compensation, DeLuca's complained-of "employment actions" are not actionable as they are "[e]veryday workplace grievances, disappointments, and setbacks" that do not constitute adverse employment actions as a matter of law. *Sullivan*, 2016 WL 676454, at *5 (Griesa, J.).

First, DeLuca alleges that she was unlawfully assigned to work on channels that she believes are less creative and denied her requests for assignment to her preferred channels. (Am. Compl. ¶ 277.) But "an employee's preference for one assignment over another is not actionable." *Brown v. Snow*, 2006 WL 623594, at *5 (S.D.N.Y. Mar. 13, 2006) *aff'd sub nom.,* 236 F. App'x 654 (2d Cir. 2007). In *Epstein v. City of New York,* 2009 WL 2431489, at *2 (Griesa, J.), this Court held that an employee's "belief that he was not given sufficiently attractive assignments does not show that there were materially adverse changes in the conditions of his employment." *See also Jimenez v. Donahoe*, 968 F.Supp.2d 609, 621 (S.D.N.Y.

---

case…does not equate to creating a triable issue of fact in the face of admissible evidence that the employer had legitimate, nondiscriminatory reasons for the challenged decisions." *Melman*, 98 A.D.3d at 128.

2013); *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F.Supp.2d 498, 504 (S.D.N.Y. 2013). DeLuca presents no evidence that her work responsibilities were tangibly altered, much less altered in a way that is "so significant as to constitute a setback to [her] career." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000).

Second, the alleged denial of her day shift transfer request is not an adverse action because it did not create "a materially significant disadvantage in her working conditions." *Williams v. R.H. Donnelly, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004). Not only does DeLuca not allege that her shift assignment created *any* disadvantage in her working conditions, but she also admits that she turned down opportunities to transfer to the day shift. (Am. Compl. ¶¶ 226, 229; DeLuca Tr. 314: 5-14; 330:23-331:19.) DeLuca's conclusory claim that the night shift made her personal life "more difficult" (Am. Compl. ¶ 277) is precisely the type of "subjective, personal disappointment[]" that the Second Circuit held does not "meet the objective indicia of an adverse employment action." *Williams*, 368 F.3d at 128. *See also Bunis v. Runyon*, No. 94-cv-2063, 1997 WL 639241, at *3 (S.D.N.Y. Oct. 16, 1997).

### B.   Sirius Has Legitimate Non-Discriminatory Reasons For Its Decisions That DeLuca Cannot Show Were Pretext For Gender Discrimination

As discussed above (*supra* pp. 13-15), Sirius makes all compensation determinations based on each imaging producer's performance, which is the legitimate, non-discriminatory reason why some imaging producers receive more compensation than DeLuca. *See e.g. Britt*, 2011 WL 4000992, at *10 (bonus decisions based on performance were made for legitimate, non-discriminatory business reasons). DeLuca has not presented any evidence—only groundless conjecture—to establish that Sirius' reasonable, performance-based justification for its compensation decisions is pretextual, or that Defendant was motivated by discrimination. *See Varughese*, 2015 WL 1499618, at *42.

18

DeLuca alleges a couple of stray comments that she claims show that Todd harbors a discriminatory animus towards women. These comments, even if actually made, are insufficient to demonstrate pretext because DeLuca cannot establish that the alleged comments had any nexus to the alleged employment action. *See Tomizawa v. ADT LLC*, No. 13-cv-6366, 2015 WL 5772106, at *19 (E.D.N.Y. Sept. 29, 2015) ("[s]tray remarks, even by a decisionmaker, without a demonstrated nexus to the adverse action will not defeat a motion for summary judgment"). In determining whether a remark is stray, courts consider "whether the comment was made by a decision maker, whether the comment related to the employment decision at issue, and the closeness in time of the action and the remark." *Nidzon v. Konica Minolta Bus. Sols., USA, Inc.*, 752 F.Supp.2d 336, 351-52 (S.D.N.Y. 2010).

Here, none of the alleged comments were made by Blatter, the primary decisionmaker for all aspects of imaging producer compensation.  In addition, none of the purported remarks even remotely relate to the terms and conditions of DeLuca's employment. *See Daniel,* 87 F.Supp.3d at 643, 646 (plaintiff could not prove termination was pretextual where the decisions was made by a committee, which included a supervisor who made comments about plaintiff's race and perceived sexual orientation). Further, DeLuca alleges she has been compensated differently due to her protected characteristics from the very start of her employment—years before any of the comments were purportedly made. (Am. Compl. at ¶ 46.) *See Nassry v. St. Luke's Roosevelt Hosp.,* No. 13-cv-4719, 2016 WL 1274576, at *7 (S.D.N.Y. Mar. 31, 2016) (granting summary judgment where supervisor's 3 or 4 remarks were made several weeks before plaintiff's termination, were unrelated to the decision-making process and another supervisor was ultimate decisionmaker.)

DeLuca also cannot establish pretext by demonstrating that other imaging producers who are similarly situated were treated more favorably than she was. *See e.g. Venezia v. Luxoticca Retail N. Am.*, No. 13-cv-4467, 2015 WL 5692146, at *6 (S.D.N.Y. Sept. 28, 2015). DeLuca's speculative belief that she is paid less because of her gender is insufficient to sustain a claim of disparate treatment. *See Wilcox*, 986 F.Supp.2d at 286.

### C.    Sirius Has Legitimate Non-Discriminatory Reasons For Its Decisions That DeLuca Cannot Show Were Pretext For Sexual Orientation Discrimination

In addition to failing for the same reasons as her gender discrimination claim, DeLuca's unsupported belief that she was compensated less due to her sexual orientation further fails because the evidence clearly shows that Tom Yankowski—who has been an imaging producer in the Music Department since 2001 and who is also gay—is among the highest compensated imaging producers in the Music Department. (Barry Decl. Ex. 30.) Courts in this Circuit have found that when a similarly-situated member of the plaintiff's own protected class allegedly receives favorable treatment, that negates an inference of discrimination against the plaintiff. *See Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-cv-3625, 2013 WL 3968748, at *10 (E.D.N.Y. July 30, 2013) (collecting cases holding that favorable treatment of individual in same protected class undercuts inference of discrimination); *Smith v. Planas*, 975 F. Supp. 303, 308 (S.D.N.Y. 1997). Thus, the fact that Yankowski has been among the highest compensated imaging producers throughout his 15-year career with Sirius negates any inference that DeLuca was discriminated against on the basis of sexual orientation

### VI.    **DeLuca Cannot Establish A Triable Issue of Fact On Her Retaliation Claims**

Retaliation claims are generally analyzed under the same burden-shifting framework as discrimination claims. *Turner v. NYU Hosps. Ctr.*, 784 F.Supp.2d 266, 284 (S.D.N.Y. 2011), *aff'd,* 470 F. App'x 20 (2d Cir. 2012). To withstand summary judgment, plaintiff must first

present evidence to demonstrate: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Feingold v. N.Y.*, 366 F.3d 138, 156 (2d Cir. 2004). Under Title VII, the NYSHRL and NYLL § 215, plaintiff bears the ultimate burden of proving a causal connection "according to traditional principles of but-for causation," meaning that the plaintiff must prove "her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533-34 (2013). *See also Ozawa v. Orsini Design Assocs., Inc.*, No. 13-cv-1282, 2015 WL 1055902, at *9 (S.D.N.Y. Mar. 11, 2015). Even under the NYCHRL, a plaintiff is nevertheless required to present evidence that "link[s] her complained-of [treatment] to a retaliatory motivation." *Wilcox,* 986 F.Supp.2d at 287.

### A.   Most Of The Alleged Retaliatory Actions Are Not Adverse As A Matter Of Law

First, to the extent DeLuca's retaliation claims are premised upon the denial of her preferred work assignments and shifts or an alleged hostile work environment (Am. Compl. ¶ 321), such claims must be dismissed for the reasons discussed extensively above (*see supra* pp.6-11, 17-18). Second, DeLuca alleges, in a purely conclusory manner, that the denial of her application to transfer to the Talk Department was retaliatory. (Am. Compl. ¶ 223.) This argument fails because the denial of a lateral transfer is not an adverse employment action absent objective indicia of material disadvantage, which as previously discussed does not exist here. *Beyer v. Cty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008).

Finally, DeLuca cannot demonstrate that her assignment to the Zakk Wylde roast constitutes an adverse action.[10] *Brown* 2006 WL 623594, at *5 ("subjective dissatisfaction with assignments does not constitute adverse action"). Consistent with the open medium of Sirius, the record demonstrates that other producers also have been assigned to work on similar pieces containing off-color content and that the performance contained jokes regarding a whole range of potential protected classes, not just sexual orientation as Deluca attempts to suggest. (Barry Decl. Ex. 37.) *See Varughese*, 2015 WL 1499618, at *39 (under NYCHRL, plaintiff must show disparate treatment that is "more than trivial, unsubstantial or petty"). DeLuca further admits that she was subsequently never assigned to work on another similar piece (DeLuca Tr. 304:15-18), rendering this discrete assignment nothing more than a trivial incident that is not actionable. *See e.g. Nieblas-Love v. N.Y.C. Hous. Auth.*, No. 14-cv-5444, 2016 WL 796845, at *5 (S.D.N.Y. Feb. 26, 2016); *Sullivan,* 2016 WL 676454, at *5 (Griesa, J.). *See also Lyle,* 132 P.3d at 211 (assistant for show *Friends* did not have a triable hostile work environment claim where the offensive language was part of the creative dialogue involved in show's production).

### B.   DeLuca's Complaints Are Too Remote In Time To Yield An Inference Of Causation

DeLuca cannot satisfy the causation element of a retaliation claim, which "can be established by showing that the retaliatory action was close in time to the protected activity; that other similarly situated employees were treated differently; or with direct proof of retaliatory animus." *Uddin v. City of N.Y.*, 427 F.Supp.2d 414, 432 (S.D.N.Y. 2006) (citations omitted).

---

[10] DeLuca also has not presented any evidence to show that Todd was aware of her discrimination charge at the time she was assigned to the Zakk Wylde roast, as she is required to do to make out a *prima facie* case. *Wilcox,* 986 F.Supp.2d at 288. While DeLuca may subjectively believe that her assignment was retaliatory, "[a] plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn." *Smalls v. Allstate Ins. Co.,* 396 F.Supp.2d 364, 371 (S.D.N.Y. 2005).

First, DeLuca alleges that she initially complained to Todd that she believed she earned less than some of her male subordinates in 2005. (Am. Compl. ¶¶ 72-73; DeLuca Tr. 154:21-155:10.) But the earliest act of retaliation that DeLuca alleges, the loss of her "creative channels," occurred in 2007 or the beginning of 2008, which is over two years after her initial complaint to Todd. (DeLuca Tr. 155:19-156:18.) In *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001), the Supreme Court held that an "action taken (as here) 20 months later suggests, by itself, no causality at all." *See also, e.g. Altieri v. Albany Pub. Library*, 172 F. App'x 331, 333-34 (2d Cir. 2006) (summary order).

DeLuca's own admissions also rebut any inference that her channel assignments were altered as a result of her complaints to Human Resources. DeLuca testified that she began to lose her "creative channels" in 2007 or in the beginning of 2008, and that she learned in 2008 that she would be reassigned from BPM, her "most important channel." (DeLuca Tr. 155:19-156:18; 174:17-20; Am. Compl. ¶ 86.) Again, these alleged "retaliatory acts" occurred before DeLuca complained to Human Resources in "mid-June of 2009," negating any inference of causation. (Am. Compl. ¶ 99.) *Wilcox*, 986 F.Supp.2d at 287 (no inference of causation when adverse action occurred before plaintiff's protected activity).

Next, DeLuca alleges that her "pay has been frozen for eight and a half years" and she has not received stock awards each year when they have been granted to others. (DeLuca Tr. 158:9-11.) Accepting this allegation as true, DeLuca's compensation would have been "frozen" in early 2008, which again pre-dates her complaint to Human Resources. *See Wilcox,* 986 F.Supp.2d at 287. Even if DeLuca alleges that the freeze occurred later, she has failed to identify any facts that give rise to any inference of causation, let alone facts that demonstrate that Defendant's legitimate, non-discriminatory reason for its compensation decisions—that is, that

her performance has not warranted merit increases or incentive compensation—was pretext for retaliation.

DeLuca also cannot establish causation regarding her claim that she was denied the opportunity to transfer Departments.[11] Even when afforded all the most favorable inferences, there is still at least a three-month gap between her complaint and any denial of the transfer. (*See* Am. Compl. ¶ 230; Barry Decl. Ex. 10.) *See Whitley v. Montefiore Med. Grp.*, No. 13-cv-4126, 2016 WL 1267788, at *11 (S.D.N.Y. Mar. 30, 2016) (three-month gap insufficient to support an inference of causation for a retaliation analysis under federal, state or local law); *Olorode v. Streamingedge, Inc.*, No. 11-cv-6934, 2014 WL 1689039, at *19 (S.D.N.Y. Apr. 29, 2014).

DeLuca similarly presents no evidence to support her subjective belief that her assignment to work on the Zakk Wylde roast (*see* 56.1 Stmt. ¶¶ 89-99) was retaliatory. *See Williams*, 61 A.D.3d at 71. As in *Williams,* other imaging producers have also been assigned to pieces containing off-color language and the type of work—editing the audio and clarifying its quality—was among imaging producers' job responsibilities. (Todd Aff. ¶¶ 4, 7.)

## VII.  DeLuca's Requests For Impermissible Damages Must Be Dismissed

### A.  DeLuca Cannot Recover Liquidated Damages Under Both The NYLL And FLSA

Assuming liability under the FLSA or NYLL, DeLuca is not entitled to recover overlapping liquidated damages under both statutes, as this Court recently held in *Morales v. Mw Bronx, Inc.*, No. 15-cv-6296, 2016 WL 40844159, at *8-10 (S.D.N.Y. Aug. 1, 2016) (Griesa, J.). With *Morales*, this Court joins numerous other courts in this district in an "emerging jurisprudential trend" holding that "an employee may not recover cumulative liquidated damages

---

[11] With respect to DeLuca's sparse claim that she was denied the opportunity to change to the day shift, she fails to allege any detail about when such a request was made or the circumstances of the denial. (Am. Compl. ¶ 321.) Nevertheless, DeLuca admits that Harris offered her the opportunity to change shifts in 2012, after she had already lodged several complaints with Human Resources. (*Id.* at ¶ 225.)

under both the FLSA and NYLL for overlapping claims after November 24, 2009." *Sun v. China 1221, Inc.*, No. 12-cv-7135, 2016 WL 1587242, at *4 (S.D.N.Y. Apr. 19, 2016).

    **B.**    **DeLuca Is Not Entitled To Recover Punitive Damages On Her Claims Under Title VII And The NYCHRL**

Assuming, *arguendo*, that DeLuca prevails on her claims under Title VII and the NYCHRL,[12] for all the reasons previously discussed, it is clear that she is not entitled to recover punitive damages. *Farias,* 259 F.3d at 101 (citing *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 529–30 (1999) ("[p]unitive damages are limited ... to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual'")).

## <u>CONCLUSION</u>

For all of the foregoing reasons, Sirius' motion for summary judgment dismissing DeLuca's claims in their entirety should be granted.

Dated: September 1, 2016

    PROSKAUER ROSE LLP

    By:  */s/ John P. Barry*
        John P. Barry
        Allison L. Martin
        One Newark Center
        Newark, New Jersey 07102
        (t) (973) 274-3200
        (f) (973) 274-3299
        jbarry@proskauer.com
        amartin@proskauer.com

        *Attorneys for Defendant*

---

[12] Courts analyze requests for punitive damages under the NYCHRL under the same standard as such requests under Title VII. *Farias v. Instructional Sys., Inc.*, 259 F.3d 91,101-02 (2d Cir. 2001).