UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

DEBBY DeLUCA,

                12 Civ. 8239 (TPG)

       Plaintiff,

  -against-

SIRIUS XM RADIO, INC.,

        *Defendant*.
_____


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**


            Law Offices of Scott A. Lucas
            250 Park Avenue
            20th Floor
            New York, NY 10177
            (212) 983-6000
            *Attorneys for Plaintiff Debby DeLuca*

## TABLE OF CONTENTS

**INTRODUCTION**……………………………………………………………………………1

**POINT I**: Defendant Cannot Obtain Dismissal By Disaggregating The Various Acts

and Practices That Make Up The Course of Discrimination and Retaliation,

and Examining Them in Isolation from Each Other…………………………………………..7

**POINT II**: Besides Consisting of a Series of Separately Cognizable Adverse Actions,

Defendant's Conduct Also Created a Hostile Work Environment…………………………………11

**POINT III**: Sirius's Claim that DeLuca's Work Product is Poor Makes No Sense

and Could Not Excuse Sirius's Conduct in Any Event…………………………………………16

**POINT IV**: The Law Does Not Permit the Discriminatory Withholding of Bonuses

and Stock Options…………………………………………………………………………..19

**POINT V**: Plaintiff's Equal Pay Claims Are Valid…………………………………………..21

**POINT VI**: Plaintiff's Overtime Claims Are Valid…………………………………………..23

**POINT VII**: Defendant's Request to Address Damages is Premature……………………......24

**CONCLUSION**……………………………………………………………………………..25

## INTRODUCTION

Before Debby DeLuca complained about unequal pay and discrimination, she had risen to the position of Night Manager, successfully managing a crew of producers for over five years.

After DeLuca complained about unequal pay and discrimination, her manager Mitch Todd – an admitted discriminator and self-described "Rogue Sperm" who is amused and aroused by the idea of women being violently raped -- wanted DeLuca "GONE."  So he stripped away her manager duties; lowered her performance ratings; called her a "dyke" in front of her only remaining subordinate; subjected her to other discriminatory insults and ridicule; permanently froze her salary; permanently reduced her bonus; permanently denied her the stock options regularly granted to her male peers; and subjected her to all manner of workplace reprisals.

The harassment and retaliation shook DeLuca to her core.  Todd's reprisals had damaged her career and reputation, and by 2010 it became so bad that she wrote about wanting to put a gun in her mouth.

In January 2010 Todd further humiliated DeLuca by taping an article about hysterectomies to the outside of her studio door with the words "*For Debby*" written across the front in magic marker.

The disparate treatment was just as extreme and even more undeniable in the area of compensation.  While the Department's male producers routinely receive annual salary increases, annual increases in their bonus, annual stock option grants and periodic grants of restricted stock units (RSUs), Defendant has:

- Frozen Plaintiff's salary for the past 8½ years;

1

- Substantially and permanently reduced Plaintiff's annual bonus (which was $21,807 in 2006, and is now $2,500);

- Excluded Plaintiff from any and all annual stock option grants since 2004; and

- Excluded Plaintiff from any and all RSU grants since May 2009 (the month before Plaintiff first complained to HR).

The following chart is based on compensation data provided by Defendant in discovery:



*See the*

attached Declaration of Scott A. Lucas dated September 22, 2016 ("Lucas Opposition Decl.) Exhs. 2-4.

**Background**

In 2001 when DeLuca became a Sirius imaging producer, Sirius had a strictly gender-segregated salary structure.  DeLuca and the two other female producers employed at the time were paid much less than all of their male peers.  That discriminatory pay structure was never rectified, and has therefore carried forward to this day.

But the gender-segregated salary structure and stereotyping that DeLuca experienced in this male-dominated industry could not keep DeLuca from earning a promotion to Night Manager in 2004, successfully managing a crew of 5-6 producers.

DeLuca's boss Mitch Todd is amused and aroused by the thought of women being violently raped, and described himself as "Rogue Sperm, Sr. Director of Production."  Sirius relies heavily on Todd's input in making compensation decisions.

Todd was content to have a talented woman Night Manager as long as he did not have to give her equal pay.  But when she complained about gender-based unequal pay in or about February 2008, Todd scoffed, and began rejecting her imaging production pieces more often than he had in the past.  The situation spiraled out of control, with Todd subjecting her to discriminatory insult and ridicule, rejecting her work, subjecting her to workplace reprisals, and permanently denying her the salary increases routinely granted to her male peers, substantially and permanently reducing her bonus while the bonuses of her male peers continued to increase, and permanently denying her valuable stock options routinely granted to her male peers.

DeLuca filed suit on November 13, 2012 for violations of the federal Equal Pay Act ("EPA") and New York Equal Pay Act ("NY EPA"), gender and sexual orientation discrimination in violation of the New York City Human Rights Law ("CHRL") and New York State Human Rights Law ("SHRL), gender discrimination in violation of Title VII, unlawful retaliation in violation of the CHRL, Title VII, SHRL and New York Labor Law ("NYLL"), and unpaid overtime in violation of the Fair Labor Standards Act ("FLSA") and NYLL.

The Court previously granted, in relevant part, Plaintiff's motion to compel discovery from 2001, the year Plaintiff became an imaging producer at the Company, based on "the logical

inference that, if, at the time of her promotion, plaintiff was given a lower salary than her male counterparts because of her gender or sexual orientation, then there are grounds to believe that the salary gap between plaintiff and her male counterparts persisted throughout plaintiff's employ." *Deluca v. Sirius Radio, Inc.*, 2016 WL 3034332, at *2 (S.D.N.Y. 2016).

The discovery clearly established that every female producer who worked for the Company in 2001 – the year Plaintiff became a producer – was paid less than every male producer who worked at the Company in 2001.  Accordingly, Plaintiff moved for partial summary judgment on the issue of Defendant's liability under the EPA and NY EPA.

Defendant has moved for summary judgment.  Defendant's motion is patently meritless. The accompanying Declaration of Debby DeLuca and the deposition testimony and exhibits attached thereto establish, *inter alia*, the following:

- **Todd is the Department's Leader.**  DeLuca Opposition Decl., Ex. "2" (Todd Tr. 20:9-11).

- **DeLuca complained about discrimination to Todd and, five months later, to HR.**  DeLuca Opposition Decl. ¶¶ 6 nad 39 and exhibit referenced therein.

- **Todd effectively admitted that only someone with a discriminatory mindset would transmit the sexist and discriminatory emails, as he did, and that a discriminatory attitude towards women could "*significantly impact*" one's ability to fairly judge the work of a female subordinate.**  DeLuca Opposition Decl. Ex. "2" (Todd Tr. 22:12-19; 22:24-23:6); Lucas Opposition Decl. Ex. 1-A – 1-AE (discriminatory work emails); Declaration of Scott A. Lucas dated September 22, 2016 ("Lucas Opposition Decl.")

at Ex. "1" (Expert Report on Sex Stereotyping of Dr. Peter Glick at pgs. 36-45, quoting Todd emails).

- **Todd *intentionally* discriminated against DeLuca.** DeLuca Opposition Decl. Ex. "2," Todd Tr. 99:14-100:19 (admitting he understands it would be discriminatory for a manager to say to a gay subordinate *"What kind of a dyke are you?"*) and Dkt. 47 at ¶ 74 (defendant's statement, for purposes of its motion, that Todd made the statement as alleged).

- **Sex Stereotyping often contributes to adverse employment outcomes, especially in male-dominated work environments, and work environments where performance is evaluated using highly subjective criteria.** Lucas Opposition Decl. Ex. "1" (Report on Sex Stereotyping of Peter Glick, Ph.D.)

- **Todd's Feedback is "HIGHLY subjective" and "knee-jerk":** *See* DeLuca Opposition Decl. Ex. "27".

- **Sirius's View of DeLuca's Performance, and the Compensation She Should Receive, is Based on Todd's performance assessments (which are "HIGHLY subjective" and "knee-jerk").** DeLuca Opposition Decl., Ex. "4" (Blatter Tr. 20:14-21:3: confirming Todd also judged creative abilities which would in turn be reflected in compensation recommendations); DeLuca Opposition Decl., Ex. "3" (Harris Tr. 106:2-14: Blatter receives recommendations from his direct reports [which, until some point in 2012, included Todd] regarding stock grants); DeLuca Opposition Decl. Ex. "2" (Todd Tr. 81:6-13: Todd is constantly

discussing components of all his employees' performances as needed with his superiors [including Blatter]); DeLuca Opposition Decl. Ex. "4" (Blatter Tr. 19:22-20:9:  Todd would provide regular dialogue to Blatter about individuals that comprise his department and the capabilities of each imaging producer); DeLuca Opposition Decl. Ex. "5," Blatter 30(b)(6) Tr. 69:18-70:12 (confirming Todd's past and continuing role in salary and bonus setting process); DeLuca Opposition Decl. Ex. "27".

- **There is no metric that Sirius employs for evaluating producer performance, apart from productivity reports (and DeLuca always met or exceeded the required number of imaging pieces for a particular channel).**  DeLuca Opposition Decl. Ex. "27," Ex. "5" (Blatter 30(b)(6) Tr. at 80:12-87:24).

- **Sirius Has No Excuse for Not Investigating DeLuca's Discrimination Complaints.**  DeLuca Opposition Decl. ¶¶ 137-145.

- **DeLuca has been Discriminated Against in Terms of Pay Since She Became a Sirius Producer in 2001, and has been Harassed and Discriminated Against Since She First Complained of Discrimination in 2008 and 2009.**  DeLuca Opposition Decl. ¶¶ 2-177.

**POINT I**

**Defendant Cannot Obtain Dismissal By Disaggregating
The Various Acts and Practices That Make Up The
Course of Discrimination and Retaliation,
and Examining Them in Isolation from Each Other**

The challenged acts and conduct are inextricably linked, and support liability for discrimination on the basis of gender, sexual orientation *and* retaliation.  *See* DeLuca Opposition Decl. ¶¶ 2-177.  Defendants seek dismissal by disaggregating each of the underlying facts from one another, and then locking each separated fact in a separate doctrinal box – rather than viewing the evidence as a whole.  Defendant's approach is incorrect on several levels.

*First*, it is settled that "one type of hostility can exacerbate the effect of another, and [] such aggravating harm is legally cognizable."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir.2000)); *Sogg v. American Airlines, Inc.*, 193 A.D.2d 153, 161 (1 Dep't 1993) (proper focus was on "combined factors of her sex, age, and disability"); *See also Gregory v. Daly*, 243 F.3d 687, 699 (2d Cir. 2001) ("a plaintiff seeking to demonstrate sex discrimination is not required to disentangle various threads that, after all, need not have a separate existence, given that various forms of discrimination may well co-exist in a workplace").

*Second*, Defendant's efforts to disaggregate and atomize Plaintiff's discrimination claims are unavailing.  As the Second Circuit has made clear:

> The law does not create separate causes of action for sex discrimination depending on the reason the employer denies a woman a job or a job benefit.  It does not, for instance, delineate distinct claims for employers who dislike women, doubt their abilities, demand that they conform to sex stereotypes, or want their policies to reflect actuarial differences between the sexes.  What matters, instead, is simply whether an employment action was based on plaintiff's sex.

\*\*\*

7

As a result, <u>a plaintiff seeking to demonstrate sex discrimination is not required to disentangle various threads that, after all, need not have a separate existence, given that various forms of discrimination may well co-exist in a workplace.</u> Thus, a jury might find it more plausible that a supervisor would be willing to fire a woman for refusing a sexual advance if it also had reason to think that he discounted women's abilities to be productive workers. Or it might conclude that his request for a quid pro quo reflected an insistence that women relate to men according to sexual stereotypes rather than as co-workers. And these considerations may well, in combination, demonstrate that the employee's sex played a sufficient causal role, as to result in Title VII liability. This could be so, moreover, even though, in isolation, no single way in which sex influenced the employer's decision sufficed to warrant that conclusion. *See Howley,* 217 F.3d at 151 ("[T]he court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury, in assessing whether there was impermissible discrimination ... would be entitled to view the evidence as a whole.")

*Gregory v. Daly*, 243 F.3d 687, 699 (2d Cir. 2001) (Emphasis added).

Accordingly, while the non-compensation-related acts of harassment easily meet the hostile work environment threshold, it must also be noted that adverse compensation decisions are properly considered in determining whether an actionable harassment claim has been stated. *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001) (considering "denied pay raises" in connection with evaluation of Plaintiff's "retaliatory harassment" claim); *Salerno v. City University of New York*, 2002 WL 31856953, at *3 (S.D.N.Y. 2002) (alleged "differences in pay along gender lines" could contribute to "an environment that a reasonable person would find hostile or abusive."); *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1131, n.7 (9th Cir. 2004) ("[E]vidence that McGinest was denied actual pay *or* bonus pay on account of his race would support his hostile work environment claim."); *Rother v. NYS Dept. of Corrections and Community Supervision*, 970 F.Supp.2d 78, 92–93 (N.D.N.Y. 2013) (including "overtime- and leave-pay denials" among the list of things that collectively are "certainly sufficient to plausibly suggest the existence of an objectively hostile environment.").

Consistent with the Second Circuit's reasoning in *Gregory*, the Supreme Court recently reaffirmed that a discrete act "could still be used as part of the basis for a hostile-work-environment claim, so long as one other act that was part of that same hostile-work-environment claim occurred within the limitations period." *Green v. Brennan*, 136 S.Ct. 1769, 1781, n. 7 (2016); *See also Baird v. Gotbaum,* 662 F.3d 1246, 1252 (D.C.Cir. 2011) ("[W]e find no authority for the idea that particular acts cannot as a matter of law simultaneously support different types of Title VII claims, and of course, plaintiffs are free to plead alternative theories of harm that might stem from the same allegedly harmful conduct. Thus, although a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard, neither can a court dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own."); *Chambless v. Louisiana–Pac. Corp.,* 481 F.3d 1345, 1350 (11th Cir. 2007) (a "discrete act" may be considered "[w]here the discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim"); *Perez v. U.S. Postal Service*, 2014 WL 3925317, at *10 (W.D. Wash. 2014) (same);  *Davis v. Packer Engineering, Inc.*, 2016 WL 1270425, at *6 (N.D.Ill. 2016) (although time-barred, "Webb may still use ['the failure to award a raise or bonus and salary amount determinations'] as background evidence to support his hostile work environment claims[.]"); *Perez v. U.S. Postal Service*, 2014 WL 3925317, at *10 (W.D.Wash. 2014) (same); *Royal v. Potter,* 416 F.Supp.2d 442, 451 (S.D.W.Va. 2006) ("[T]his Court does not read the *Morgan* decision as eliminating discrete acts from consideration in determining hostile work environment claims with non-discrete acts."); *Grady v. Cracker Barrel Old Country Store, Inc.*, 2007 WL 1959298, at *7 (Md.Pa. 2007) ("[T]o establish an objectively hostile work environment, Plaintiff must establish

that the alleged harassment was "serious and tangible enough to alter [her] <u>compensation</u>, terms, conditions, or privileges of employment.") (emphasis added).[1]

*Third*, "there may be multiple but-for causes, and '[t]he determination of whether retaliation was a 'but-for' cause ... is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Ya-Chen Chen v. City University of New York*, 805 F.3d 59, 78 (2d Cir. 2015).

*Fourth*, while gender discrimination and sexual orientation discrimination claims are still ordinarily considered distinct, in this case they do not merely exacerbate one another, *Charley v. Total Office Planning Services, Inc.*, 2016 WL 4705164, at *4, n.6 (S.D.N.Y. 2016) ("As 'one type of hostility can exacerbate the [e]ffect of another,' we consider Oddo's comment allegedly motivated by gender and sexual-orientation hostility in evaluating Charley's Section 1981 claim.") (internal citation omitted), they are <u>inextricably</u> <u>linked</u> because due to two particular aspects of Todd's discriminatory bias.  By stating "*What kind of dyke are you?*" in response to learning that DeLuca does not like sports (DeLuca Opposition Decl. ¶ 17), Todd was making a statement about DeLuca not meeting "*society's stereotypical norms about how ... lesbian women ... act,*" and was thus discriminating against her, *inter alia*, for not acting in accordance with the

---

[1] To avoid any confusion on the issue, Plaintiff makes clear that she does *not* seek to use *<u>federal</u>* law to recover raises or stock options discriminatorily withheld outside of the applicable Title VII or federal EPA statutes of limitations.  *Royal v. Potter*, 416 F.Supp.2d 442, 452 (S.D.W.Va. 2006) ("[A] district court's duty under *Morgan* is to determine whether the plaintiff has provided evidence of an actionable hostile work environment which may include an otherwise discrete act or has made a claim for hostile work environment when in actuality the plaintiff is attempting to recover on time barred discrete acts.").[1]  However, *New York law* does recognize discriminatory pay as a continuing violation.  *Jelcich v. Warner Bros., Inc.*, 1998 WL 42574, at *6 (S.D.N.Y. 1998) ("New York recognizes discriminatory pay as a continuing violation, *see Summers v. County of Monroe,* 147 A.D.2d 949, 949, 537 N.Y.S.2d 703, 705 (4th Dep't 1989); *Matter of Horn v. New York State Human Rights Appeal Bd.,* 75 A.D.2d 978, 428 N.Y.S.2d 368 (3d Dep't 1980), and defendants' last payment to plaintiff occurred within the limitations period."); *Torres v. Vittoria Corp.*, 2008 WL 2937180 (N.Y. Sup. 2008) (same).  *See also* Dkt. 55-1, Amended Complaint ¶¶ 46-54, 71, 85, 315:  describing the male-only "75 Club" that existed for male imaging producers employed as of 2001, and the "continu[ing]" and "ongoing" pay discrimination DeLuca experienced); *See also* Dkt. 36, Plaintiff's June 2, 2016 opposition to Defendant's motion to vacate, Dkt. 51-55 (Partial Summary Judgment Papers).

way she looks, *i.e.*, like a "*dyke*."  *Hively v. Ivy Tech Community College, South Bend*, 2016 WL 4039703, at *9 (7th Cir. 2016) (discussing "*odd state of affairs in the law in which Title VII protects ... lesbian[s], but frequently only to the extent that ... lesbian women have masculine mannerisms*").   In addition, Todd's offensive and discriminatory remark to DeLuca shortly after he made an angry fake apology to her after the "*dyke*" incident about a gay female VP named Trinity whom Todd said was probably out "*having a sex change*" (DeLuca Opposition Decl. ¶¶ 34-50) is also gender-related because it implies that gay women are really men on the inside, and can be presumed to be out having a sex change if they miss work:  the anti-discrimination laws bar discrimination based on the mistaken belief that the plaintiff is a member of a particular protected group (e.g., transgender people).  *Capek v. BNY Mellon, N.A.*, 2016 WL 2993211, at *3 (S.D.N.Y. 2016); *See also Fabian v. Hospital of Central Connecticut*, 2016 WL 1089178, at *14 (D. Conn. 2016) (transgender discrimination is sex discrimination).

The accompanying DeLuca Opposition Declaration, and the testimony and exhibits annexed thereto, revealed an inter-related course of discriminatory, retaliatory and harassing acts against DeLuca for being a gay female who made the mistake of complaining about unequal pay and intentional gender and sexual orientation discrimination.  Defendant's motion is meritless.


**POINT II**

**BESIDES CONSISTING OF A SERIES OF SEPARATELY COGNIZABLE ADVERSE ACTIONS, DEFENDANT'S CONDUCT ALSO CREATED A HOSTILE WORK ENVIRONMENT**


**A.     Conduct was Severe:**  Much of the conduct was severe.  DeLuca was humiliated by Todd calling her a "dyke" in front of her only remaining subordinate, stripping her of her managerial authority, trying to make her "GONE," and maliciously divulging her planned

hysterectomy.  Because of Todd's harassment, DeLuca, by way of example, was unable to sleep for three days; wrote about putting a gun in her mouth; delayed surgery for 12-13 months for a large cyst growing in her uterus, until the physical pain became unbearable; began seeing a psychiatrist and taking Zoloft and Xanax for depression; and was deprived of *substantial* income due to permanent denial of raises, the permanent reduction of her bonus, and the permanent exclusion from stock awards, all of which she would have received if she were a non-complaining male producer.  DeLuca Opp. Decl. ¶¶ 2-185.

      **B.**    **The Conduct was Frequent:**  The conduct was frequent, affecting DeLuca on a weekly if not daily basis, because, in addition to several instances of discriminatory insult and ridicule, two of which were extremely humiliating, it included unequal pay and withheld salary raises, bonuses and stock options, *Gregory v. Daly*, *supra*; *Salerno v. City University of New York*, *supra* (unequal pay may be considered as part of hostile work environment claim), and a series of smaller and not-so-small reprisals including, *inter alia*, taking away prestigious channels, taking away work assignments, denigrating DeLuca in front of her peers and direct reports, isolating her from programmers and peers by denying her a day shift assignment after the other night shift producers were moved to day shift positions, interfering with her efforts to transfer out of the Department, forcing her to see HR and get a doctor's note before allowing her to work two days from home where she has a studio with superior equipment than what Sirius has, denying the availability of Christmas Eve as a vacation day so that it could be given to less experienced male producers who didn't ask to have it off until much later; falsely indicating that it was critical that she find a way into Manhattan in the immediate aftermath of Hurricane Sandy; lying about feedback given by programmers and producers; dramatically lowering her performance evaluation; refusing and failing to investigate her complaints of discrimination,

threatening a witness to an intentionally discriminatory statement, hand-picking her to add laughter to a CD with dozens of extreme anti-gay "jokes," giving her bogus channel with no programmer, passing off her work as that of a man, and then falsely promising it was done as part of a plan to get her a new channel, etc.).  Although the linkage between these incidents and practices is clear, summary judgment would be appropriately denied even if it was <u>not</u> clear. *Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir. 2002) ("In a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build [a] case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent."); *See also Rigodon v. Deutsche Bank Securities, Inc.*, 2004 WL 2471859, at *3 (S.D.N.Y. 2004) ("the accumulation of small reprisals may be aggregated so as to permit consideration of their impact in their totality and to support their being deemed sufficient to constitute adverse employment action."); *Ward v. Shaddock*, 2016 WL 4371752, at *8 (S.D.N.Y. 2016) ("less desirable evening shift between 2001 and 2014 could reasonably impact the work environment"); *Id.* ("the conduct, which also included Shaddock's discriminatory hiring practices, the discriminatory manner in which he made job assignments, and his acquiescence in racially discriminatory conduct by Caucasian subordinates, could have 'actually altered the conditions of [Ward's] employment'"); *Raniola v. Bratton,* 243 F.3d 610, 621 (2d Cir.2001) (triable issues existed where plaintiff demonstrated that she was subjected to offensive sex-based remarks, disproportionately burdensome assignments, and workplace sabotage over the course of two and a half years); *Butler v. New York Health & Racquet Club*, 768 F.Supp.2d 516, 535 (S.D.N.Y. 2011) ("a reasonable finder of fact considering all of the evidence could conclude that NYHRC had embarked on a campaign of petty harassment intended to dissuade Butler from pursuing her EEOC claims.")*; Borrero v. American*

13

*Exp. Bank Ltd.*, 533 F.Supp.2d 429, 438 (S.D.N.Y.,2008) (Chin, J.) ("Although these claims are not actionable in and of themselves, other claims, such as unequal pay, are materially adverse employment actions and, thus, actionable. Moreover, even if some of Borrero's allegations of disparate treatment are not actionable, they may nonetheless constitute evidence of discrimination in the terms and condition of her employment. For example, even if unfair public criticism and overbearing scrutiny by themselves are not actionable, they may still show that other more materially adverse actions were motivated by gender.").

      **C.**     **The Conduct Threatened Plaintiff's Physical Health, and was Humiliating:**

Workplace bullying is a serious issue and can have terrible consequences. DeLuca's physical health was jeopardized by the harassment. She delayed surgery for 12-13 months, *in part* due to her desire to put "space" between Todd's malicious and humiliating disclosure of her planned hysterectomy and the surgery itself to avoid being seen by her all-male peer group as receiving special treatment for a "woman problem" at a time when her status as a respected member of the team was already in jeopardy. When she had the surgery 12-13 months later she could wait no longer: the fibroid tumor was bigger, more painful, and more bleeding. DeLuca Opp. Decl. ¶ 71. She was also so distraught about the situation at work that she barely slept in three days, and wrote to producer Bryan Apple:

> Mitch is making me do some pieces of production for other
> channels so I could show I'm a producer an[d] justify my job.
> You know the job I have been doing for 20 years now. <u>I just want
> to stick a gun in my mouth</u>.

DeLuca Opp. Decl. Ex. "23" (emphasis added).

      **D.**     **The Conduct Interfered with Plaintiff's Work Performance:** Besides interfering with DeLuca's ability to receive ordinary salary increases, bonus increases and stock options (*compare* the chart at the end of the DeLuca Opposition Declaration with Ex. "2" thereto

at 189:23-190:7 [confirming that annual salary increases are the norm at Sirius]), Todd's excessive rejection of DeLuca's work as payback for complaining about discrimination interfered with her ability to be promoted again to a manager position, where she was a proven success; interfered with her ability to be assigned to the more prestigious channels; and interfered with her ability to have her discrimination complaints taken seriously, as every time she complained to HR, HR shifted the subject from Todd's discrimination to her alleged lack of competence.  DeLuca Opp. Decl. ¶¶ 106-07.

   In addition, being relegated to the night shift *after* the other producers were moved to days meant that DeLuca was more isolated than ever, and the night shift also gave her much less access to the programmers and voice talents she works with as part of her job.  Thus it clearly affected her performance here as well.  DeLuca Opp. Decl. ¶ 30.

   The failure to investigate, in turn, emboldened Todd to commit further discriminatory acts that may well not have been committed if HR had acted firmly to address Todd's conduct when she complained to HR about Todd calling her a "dyke".  If Todd had been suspended, or reprimanded and sent to sensitivity training, then perhaps he would not have engaged in further discrimination and harassment.  Perhaps most important, an actual and meaningful investigation would have made continued harassment and discrimination too dangerous for Todd to engage in, which, in turn, would have enabled her to have her work judged fairly.  DeLuca Opp. Decl. ¶¶ 106-07.

   In addition, 2008 – the year DeLuca complained to Todd that she was being underpaid because she's a woman – is when Todd sent an email stating he wanted DeLuca (unlike the vast majority of the Sirius employees employed at the time Sirius acquired XM) "GONE".  DeLuca Opp. Decl. Ex. "11".  This email, coupled with Todd's 2016 testimony that he would like to

replace DeLuca (Todd Tr. 180:12-20 [DeLuca Opp. Decl. Ex. "2"]), provides clear support for DeLuca's retaliatory harassment/hostile work environment claims, *see*, *Dortz v. City of New York*, 904 F.Supp. 127, 138 (S.D.N.Y. 1995) (manager's statement indicating he may want to replace plaintiff could show "intent on Defendants' part to create intolerable working conditions"), especially in light of upper management's admission that there is no reason to why Plaintiff should not remain employed.  Blatter Tr. 149:3-11 (DeLuca Opp. Decl. Ex. "4").

Finally, it is noted here that the standards for proving retaliation is lower than the Title VII standard (which DeLuca easily satisfies in any event), *Burlington N. and Santa Fe R.R. v. White*, 548 U.S. 53, 62–63 (2006), and that the City Human Rights Law's "less well than" standard is particularly easy to satisfy. *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) ("plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender.' Under this standard, the conduct's severity and pervasiveness are relevant only to the issue of damages.").

## POINT III

### Sirius's Claim that DeLuca's Work Product is Poor
### Makes No Sense and Could Not Excuse Sirius's Conduct in Any Event

In an effort to justify its discriminatory and retaliatory misconduct, Sirius has levelled two basic criticisms against DeLuca.  First, it claimed that DeLuca is not tech-savvy.  Second, it claimed she is not creative.  Neither claim has merit.

The first claim is nothing short of bizarre, as DeLuca has always had far more advanced technical knowledge than Department Manager Todd, and, before him, Department Manager Verson.  Moreover, unlike most of her male peers, DeLuca had and has a full home studio with

more advanced production equipment, plug-ins and software than Sirius uses, and a library of

more than 7,000 sound effects, all of which she regularly uses when doing her imaging

production work for Sirius.  In addition:

- DeLuca was the first producer in the Department to use a File Transfer Protocol (FTP) to "bounce" files from remote locations onto Sirius's system.

- During a weekly Department meeting DeLuca proposed using Spotify and Dropbox to facilitate greater connectivity, an idea Mitch Todd poo-pooed, but later adopted.

- During a weekly Department meeting DeLuca proposed using an app called "tape machine," which allows producers to using their cell phones as a microphone on the fly to record people in the street, edit the recording on the phone, and then bounce it back as an MP3 or wave file.  Not grasping the concept, Mitch Todd replied "*Wow, yeah, like our $5,000 computers don't do something like that.*"

DeLuca Opp. Decl. ¶¶ 111-115.

The second claim, that DeLuca is not "creative" enough, is conveniently unverifiable.  As

the Second Circuit has stated:

> In employment discrimination cases, courts must give particular scrutiny to 'subjective evaluation[s],' because (1) 'any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case' and (2) a discriminatory consideration such as age [or here, gender, sexual orientation, or retaliation] could play into the 'formation of subjective impressions.'

*Weiss v. JPMorgan Chase & Co.*, 332 Fed.Appx. 659, 661, 2009 WL 1585279, at *2 (2d Cir.

2009), quoting *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 104-06 (2d Cir. 2001).

As to the issue of subjectivity, Todd has already acknowledged that his feedback to the

Department's imaging producers is "*HIGHLY subjective*" and "*knee-jerk*".  DeLucas Opp. Decl.

Ex. "27" hereto (underlining added; capitalization in original).

17

Defendant's "poor performance" argument fails for a far more obvious reason:  *How could someone good enough to manage, evaluate, and guide the work of six producers for more than five years, and whose annual performance evaluations were mostly positive before she complained about gender-based pay disparities, suddenly turn into a poor performer?*  DeLuca Opp. Decl. ¶¶ 5-6.  When confronted with the same issue, the court in *Pedreyra v. Cornell Prescription Pharmacies, Inc.*, 465 F. Supp. 936 (D. Colo. 1979) concluded:

> Nor is it reasonable to believe that the quality of [plaintiff's] performance would have suddenly deteriorated after a long period of satisfactory performance.

465 Supp. at 946-47.

While Todd and those above him have been busy trying to isolate DeLuca and diminish her standing in the Department, and has succeeded to a limited extent, DeLuca continues to receive regular praise for her high-quality work from numerous co-workers.  DeLuca Opp. Decl. Ex. 29.  *See also Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54–55 (2d Cir. 1998) ("Danzer's claim that his performance had remained acceptable is no more conclusory than Norden's assertion that it had deteriorated.")

As to the issue of "discriminatory consideration[s] … play[ing] into the 'formation of subjective impressions,'" the Court is respectfully referred to the Report on Stereotyping of Peter Glick, Ph.D., attached as Lucas Opp. Decl. Ex. "1".  Dr. Glick's testimony on sex stereotyping was found reliable in *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F.Supp.2d 208, 214–15 (D.Mass. 2009):

> unlike Dr. Huntoon's, Professor Glick's opinion is based not simply on experience, but also social psychological testing of stereotyping and discrimination over the past thirty or forty years. It is rooted in the study of stereotypes (beliefs about social groups), prejudice (biased feelings towards social groups), and discrimination (differential treatment of social

18

groups). This work has been conducted in both the laboratory and field settings (working adults, large organizations such as the armed forces, etc.).

Significantly, testimony of this sort has been introduced in other discrimination cases. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), marked the Supreme Court's first consideration of expert psychological testimony on stereotyping in a gender discrimination case.  Social psychologist Dr. Susan Fiske, Professor Glick's colleague, testified about gender stereotyping patterns in the accounting firm partner selection process, the significance of the fact that the plaintiff was the only woman in the pool of candidates, and the subjectivity of the evaluations without indicating whether any particular comment was the result of stereotyping. 215 490 U.S. at 235–36, 109 S.Ct. 1775.

592 F.Supp.2d at 214–15.


## POINT IV

### The Law Does *Not* Permit the Discriminatory Withholding of Bonuses and Stock Options

Defendant claims that discretionary bonuses and stock grants can be made in a discriminatory manner without violating the New York Equal Pay Act (Labor Law § 194).  That is not so.

"New York's Equal Pay Act is analyzed under the same standards applicable to the federal Equal Pay Act."  *Lehman v. Bergmann Associates, Inc.*, 11 F.Supp.3d 408, 420 (W.D.N.Y. 2014) (citing cases).  "All forms of pay are covered by the EPA, including salary, overtime pay, bonuses, stock options, profit sharing and bonus plans, life insurance, vacation and holiday pay, cleaning or gasoline allowances, hotel accommodations, reimbursement for travel expenses, and benefits."  *Heidi B. v. Burwell*, 2016 WL 3361318, at *2 (citing EEOC Compliance Manual, Number 915.003, Section 10: Compensation Discrimination (December 5, 2000) and 29 C.F.R. § 1620.10); *See also Davies v. Broadcom Corporation*, 130 F.Supp.3d

19

1343, 1350 (C.D.Cal. 2015) (denying dismissal of EPA claim that male comparator "received more than three times the value of equity that she received and significantly higher bonuses."); *Bailey v. Lucent Technologies, Inc.*, 2004 WL 2106557, at *1, at n.1 and n.4 (E.D.Pa. 2004) (EPA case denying defendant's motion in limine to exclude evidence that plaintiff received fewer stock options than male comparators); *Hawley v. Blackboard, Inc.*, 2005 WL 513496, at *8 (D.D.C. 2005) (denying summary judgment in part on EPA claim:  "To the extent [plaintiff's claim of unequal stock option grants in violation of the EPA] relates to Napolitano, however, if she can prove her allegations at trial, it clearly rises to the level of an adverse employment action[.]").

The Second Circuit has emphatically rejected the notion that discretionary benefits can be doled out in a discriminatory manner.  *Davis v. New York City Dept. of Educ.*, 804 F.3d 231, 235–36 (2d Cir. 2015); *See also Lavin-McEleney v. Marist College*, 239 F.3d 476, 483 (2d Cir. 2001) ("The Equal Pay Act and Title VII must be construed in harmony, particularly where claims made under the two statutes arise out of the same discriminatory pay policies.").

The same rule applies to NY EPA claims.  *See Quinn v. JPMorgan Chase & Co.*, 2006 WL 1440876, at *9 (N.Y.Sup. 2006) ("JPMC's argument that some males received higher bonuses than plaintiff because they were higher revenue producers merely raises an issue of fact for trial."); *Hart v. Dresdner Kleinwort Wasserstein Securities, LLC*, 2006 WL 2356157, at *7 (S.D.N.Y. 2006) (denying dismissal of New York Equal Pay claim based on allegation that plaintiff "was paid an allegedly discriminatory bonus in 2003"); *Volpe v. Nassau County*, 915 F.Supp.2d 284, 289, n.2 (E.D.N.Y.,2013) (denying dismissal of new York Equal Pay Act claims, and stating, in connection therewith, that if Plaintiffs wish to do so, they may add claims for "increased pension and retirement benefits" in connection therewith).

Moreover, in *Pachter v. Hodes Group, Inc.*, 10 N.Y.3d 609, 616, 861 N.Y.S.2d 246 (2008), the New York Court of Appeals made clear that it would be "absurd" to construe the NY EPA in a manner that did not bar gender-based compensation disparities:

> [U]nder the interpretation of "employee" proposed by Hodes, Labor Law § 194 would not prohibit employers from paying similarly situated executives at different rates of compensation solely on account of their gender—an absurd proposition that the Legislature surely did not intend.

*See also Jancey v. School Committee of Everett*, 658 N.E.2d 162, 169, 421 Mass. 482, 493 (Mass. 1995) ("a narrow construction [of the term 'wages' in state law counterpart to EPA] could also allow some employers to evade the purposes of the legislation by paying male and female employees in comparable jobs the same hourly rate, but discriminating against employees on the basis of sex in providing insurance and other benefits.  Such an interpretation makes no sense where the commonly understood meaning of the term 'wages' would avoid such an inequitable result.").

Put simply, there is no basis for this Court to adopt an "absurd" construction of the NY EPA (*Pachter*, *supra*) that does not bar Sirius from denying Plaintiff stock options and reducing her annual bonus because she is a woman.

## POINT V

### Plaintiff's Equal Pay Claims Are Valid

Defendant offers no reason for dismissing Plaintiff's equal pay claims, and, having studiously ignored the Court's May 27, 2016 Order, cannot do so.  Although Defendant claims that DeLuca has not established a prima facie case, Plaintiff incorporates the points and evidence submitted in her motion for partial summary judgment (Dkt. 51-55).  *See* also DeLuca Opp. Decl. ¶¶ 171-76.  "[A] *prima facie* showing of an EPA violation also establishes, as a matter of

law, a *prima facie* case of gender-based pay discrimination in violation of Title VII."  Butler *v. New York Health & Racquet Club*, 768 F. Supp. 2d 516, 533 (S.D.N.Y. 2011).  Pplaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are "'substantially equal" in skill, effort, and responsibility".  *Lavin-McEleney v. Marist College*, 239 F.3d 476, 480 (2d Cir.2001).  A plaintiff pointing to the disparate treatment of a similarly situated employee must show that the two were similarly situated "'in all material respects'-not in all respects."  *Scelfo v. Aurora Concept, Inc.*, 2006 WL 336038, at *10 (S.D.N.Y. 2006).  "Thus, to meet her minimal burden, a plaintiff seeking to establish a prima facie case of discrimination must compare herself to another employee whose situation is sufficiently similar to the plaintiff's "to support at least <u>a minimal inference that the difference of treatment may be attributable to discrimination</u>."  Finally, given its liberal scope and purpose, the NYCHRL standard is no more stringent than the Title VII/EPA standard.

The fact that Plaintiff and the male producers have the same job (music imaging production) working under the same boss in the same location easily meets that "minimal burden".  And the chart appearing near the end of the DeLuca Opposition Declaration leaves retaliation and or discrimination as the <u>only</u> plausible explanation for the long-term freezing of Plaintiff's – and only Plaintiff's – salary and bonus, and the long-term deprivation of stock options and RSUs to Plaintiff and only Plaintiff.  Defendant must be made to answer for what they have done to Ms. DeLuca.

It is noted here that the statute of limitations is misidentified in Defendant's moving brief as running from the date of the Complaint was filed, as opposed to the date the January 20, 2012 State Division of Human Rights complaint was filed.  *Esposito v. Deutsche Bank AG*, 2008 WL 5233590, at *4 (S.D.N.Y. 2008).  As noted, however, in contrast to federal law, "New York

recognizes discriminatory pay as a continuing violation[.]" *Jelcich v. Warner Bros., Inc.*, 1998
WL 42574, at *6 (S.D.N.Y. 1998) (citing cases); *Torres v. Vittoria Corp.*, 2008 WL 2937180
(N.Y. Sup. 2008) (same).


## POINT VI

## PLAINTIFF'S OVERTIME CLAIMS ARE VALID

Paragraphs 164-170 of the DeLuca Opposition Declaration show that Ms. DeLuca is not
an exempt employee.  An advanced degree is not required to do radio production – indeed,
Plaintiff's boss Mitch Todd only has a high school diploma.  Likewise, radio producers are not
administrators – they are production employees.  *Cooke v. General Dynamics Corp.*, 993 F.Supp.
56, 61 (D.Conn.,1997) ("the administrative/production dichotomy focuses not on whether an
employee worked for an enterprise engaged in production activity, but whether the employee's
primary duty was producing the product in question."). Hence the title "producers".

Production employees are non-exempt.  The "product" is radio imaging – sweepers,
promos, jingles; the discretion used in creating those products is monitored closely by and reined
in my management rules and oversight.  *See* Paragraphs 164-170 of the DeLuca Opposition
Declaration.

The only known radio industry producer overtime case supports this view.  *Cummins v.
Carteret Broadcasting Co.*, 137 F.Supp. 547, 550 (E.D.N.C. 1956) ("Plaintiff was responsible
for the technical operation of the equipment, made repairs, made required F.C.C. checks, acted as
Program Director, and, though not employed to do so, was permitted to engage in sports
announcing; he did other announcing, ran musical programs, acted as disc jockey, put news in
the machine, edited news, read it on the air, assisted in putting on programs, set up meetings and

clubs, attended baseball meetings as sports announcer for the station, and performed other services outside his duties as Chief Engineer and not ordinarily performed by an engineer. Such outside services occupied him for more than half the time when he was actually on duty. He was a 'combination man' such as may be found at most radio stations."  ***  While plaintiff's activities were such as to fulfill some of the conditions prescribed for an executive employee, and for an administrative employee, and for a professional employee, as I view it, the evidence does not demonstrate that all required conditions are fulfilled as to any one of the three classes. This conclusion, to my mind, is inescapable and clear.").

It is a "heavy burden" to prove an FLSA exemption, and Defendant has not come close. Defendant's motion should be denied.


## POINT VII

### Defendant's Request to Address Damages is Premature

The issue of cumulative damages under the FLSA and NYLL is premature at this juncture.  It would be unwise to address it now, when there is no reason to do so, because the law is in a state of flux and there is a good chance this sharply divided issue will reach the Circuit in the next 12 months.  The scope of liquidated or punitive damages is not a separate cause of action and should not be addressed at this juncture.

## <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully requested that Defendant's motion for summary judgment be denied.

Dated:      New York, New York
            September 22, 2016

                                    Law Offices of Scott A. Lucas
                                    250 Park Avenue
                                    20th Floor
                                    New York, NY 10177
                                    (212) 983-6000
                                    *Attorneys for Plaintiff Debby DeLuca*

                                    By:   <u>*Scott A. Lucas*</u>