UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _8/7/2017_

DEBBY DeLUCA,

          Plaintiff,

     -against-                                          No. 12-cv-8239 (CM)

SIRIUS XM RADIO, INC.,

          Defendant.

------------------------------------------------------------x

### DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

McMahon, C.J.:

Plaintiff Debby DeLuca ("Plaintiff") brought this action against her employer, Defendant Sirius XM Radio, Inc. ("Defendant"), a satellite radio provider, alleging claims of (1) gender discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Code § 8-107 *et seq.*; (2) sexual-orientation discrimination, in violation of NYHRL and NYCHRL; (3) unequal pay, in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); and the New York Equal Pay Act ("NYEPA"), N.Y. Labor Law § 194; (4) unlawful retaliation, in violation of Title VII; NYHRL; NYCHRL; and the New York Labor Law ("NYLL"), N.Y. Labor Law § 215; and (5) unpaid overtime, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*; NYLL § 663.1; and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.

Since early 2001, Plaintiff has been employed by Defendant as an "imaging producer." This position essentially entails creating most of the non-music audio for a radio station,

including jingles and promotional clips. Plaintiff alleges that, throughout her time working for

Defendant, she was paid less than her male counterparts, and that, beginning in 2009, Defendant

stopped giving her annual pay increases (unlike her male coworkers), began taking away her

higher-profile assignments, and denied her request to transition to a day shift. She also asserts

that she was subjected to various forms of harassment on account of her gender and sexual

orientation.

Before the Court are Defendant's motion for summary judgment dismissing the amended

complaint (Dkt. No. 45), and Plaintiff's motion for partial summary judgment in her favor on her

equal pay claims (Dkt. No. 51). For the reasons set forth below, Defendant's motion is granted in

part and denied in part; Plaintiff's motion is denied.

### Factual Background

The following facts are drawn from the Statement of Undisputed Facts Pursuant to Local

Rule 56.1 in Support of Defendant's Motion for Summary Judgment ("Def.'s 56.1"), Dkt. No.

47; Plaintiff's Responses and Objections to Defendant's Rule 56.1 Statement ("Pl.'s Resp.

56.1"), Dkt. No. 71; Defendant's Reply to Plaintiff's Response to Defendant's Local Rule 56.1

Statement of Material Facts ("Def.'s Reply 56.1"), Dkt. No. 82; Plaintiff's Rule 56.1 Statement

("Pl.'s 56.1"), Dkt. No. 79; and Defendant's Responses and Objections to Plaintiff's Rule 56.1

Statement ("Def.'s Resp. 56.1"), Dkt. No. 63.

Unless otherwise noted, these facts are not in dispute. However, on a few occasions, the

parties have either (1) failed to support their factual assertions with admissible evidence,

(2) failed to specifically controvert the moving party's factual statements, or (3) failed to cite to

admissible evidence in support of their controverting statements. *See* Local Rule 56.1(c)-(d). On

a motion for summary judgment, "A non-moving party cannot create a factual dispute merely by

denying a movant party's factual statement; rather, the non-moving party must identify

controverting evidence for the court." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 Civ. 4763, 2006 WL 2136249, at *3 (S.D.N.Y. Aug. 1, 2006). Accordingly, if the movant's statement of material facts is supported by admissible evidence, it "'will be deemed to be admitted for the purposes of the motion unless specifically controverted by a correspondingly numbered paragraph' in the opposing party's Rule 56.1 statement and 'followed by citation to evidence.'" *AFL Fresh & Frozen Fruits & Vegetables, Inc. v. De-Mar Food Servs. Inc.*, No. 06 Civ. 2142, 2007 WL 4302514, at *5 (S.D.N.Y. Dec. 7, 2007) (quoting Local Rule 56.1) (emphasis removed). Statements deemed admitted for the purposes of the motion are denoted with the parenthetical "(deemed admitted)."

## I.    The Parties

Defendant is a satellite radio company that creates and offers commercial-free music and other programming. (Def.'s 56.1 ¶ 1.) Defendant offers over 175 channels of programming which span a wide variety of genres. (*Id.* ¶ 2 (deemed admitted).) Defendant was formed in July 2008 as a result of a merger between Sirius Satellite Radio, Inc. ("legacy Sirius") and XM Satellite Radio Holdings, Inc. ("legacy XM").

The company's Chief Content Officer, Scott Greenstein, oversees the different "programming" departments, which are differentiated on the basis of content (*e.g.*, the "Music Department," the "Talk Department," the "Sports Department"). (*Id.* ¶ 5.) The manager of the Music Department is Steven Blatter, Senior Vice-President and General Manager, Music Programming. (*Id.*) Within the Music Department is the Music Imaging Production Department, which employs Plaintiff. (*Id.*)

Each music channel is typically assigned a "programmer" – who selects the songs that are aired on the channel – and an "imaging producer." (*Id.* ¶¶ 12, 13.) Imaging producers (sometimes just called "producers") "are responsible for creating all of the audio content, other than the

actual songs themselves, that airs on the music channels." (*Id.* ¶ 15.) This includes creating "promos" (a form of commercial advertising to promote a radio program), "sweepers" (a short, pre-recorded sample used to segue between songs and identify the channel), and special features. (Pl.'s 56.1 ¶ 37.) In creating these elements, imaging producers must devise content, use sound effects, and work with voice talents. (*Id.* ¶ 38.) Imaging producers are generally assigned to work on multiple channels in different music genres at the same time. (*Id.* ¶ 45; *see also* Barry Decl. Ex. 15 (imaging producer position description).)

Plaintiff was hired by legacy Sirius as a production assistant on July 17, 2000. (Pl.'s 56.1 ¶ 29 (deemed admitted).) She was promoted to imaging producer on February 1, 2001. (*Id.* ¶ 32 (deemed admitted).) Plaintiff has been continuously employed by legacy Sirius (and then by Defendant following the 2008 merger) as an imaging producer in the Music Imaging Production Department since that time.

For the first two years of her employment, Plaintiff was supervised by Tom Versen, Director of Programming and Creative Services. (Def's 56.1 ¶ 37.) In November 2002, Plaintiff's supervisor became Mitch Todd, Director of Production for Music and Marketing, who currently heads the Music Imaging Production Department. (*Id.* ¶ 38.)

## II.   Plaintiff's Compensation

Plaintiff's salary when she was first hired as a production assistant was $45,000 per year, with the possibility of bonuses and stock options. (Barry Decl. Ex. 20 at 1 ("Offer Letter"), Dkt. No. 50-10 at 15.) Plaintiff was told by the manager who hired her, Versen, that she would be eligible for the next imaging producer position that became available, and she understood from their conversation that such a position would involve a pay increase. (Pl.'s 56.1 ¶¶ 25-28

(deemed admitted)[1].) Plaintiff's formal offer letter, however, makes no mention of a future position as a producer or a promised pay increase. (*See* Offer Letter at 1-2.)

Within four months of hiring Plaintiff as a production assistant, Defendant hired four imaging producers (Peter Gustin, Teddy Zambetti, Mitch Todd, and Torey Drinker), all of them male. (Pl.'s 56.1 ¶¶ 30-31.) Plaintiff testified that, after these hires, she reminded Versen of his previous assurance that she would be eligible for the next available imaging producer position; she was promoted to imaging producer on February 1, 2001. (*Id.* ¶ 32 (deemed admitted).)

At the time she was made an imaging producer, Plaintiff was the only female producer in her department; there were approximately eight male producers. (Def.'s Resp. 56.1 ¶¶ 60-61.) During 2001, several producers left the department and several new producers were hired, including two other female producers, Suzanne Ventra and Catherine Sardina, who were hired in October 2001. (*Id.*) Both of these women left the department by 2004. Since that time, Plaintiff has been the only female producer in the department. (DeLuca Decl. ¶ 12, Dkt. No. 68.)

On November 13, 2001, another male producer, Tom Yankowski, was hired. (Barry Decl. Ex. 29 at SIRIUS XM 0125985.) Plaintiff and Yankowski are the only producers hired in 2001 who still remain producers in the department. (*See* Def.'s Resp. 56.1 ¶ 62.) Plaintiff testified that she and Yankowski are also the only openly gay producers in the department. (*See* Barry Decl. Ex. 3 ("DeLuca Dep. Tr.") at 127:14-16, 129:10-16.)

---

[1] Defendant asserts that Versen's statements are hearsay, and are therefore inadmissible, but Defendant is incorrect. *See* Fed. R. Evid. 801(d)(1). As Defendant has proffered no evidence that contradicts Plaintiff's testimony, these facts are undisputed for purposes of this motion.

The eleven male producers employed by Defendant at some point during 2001 all had annual salaries between $62,000 and $78,750 in that year. (Pl.'s 56.1 ¶ 62.)[2] Of the three female producers, Plaintiff and Ventra were paid $55,000 in 2001, and Sardina was paid $40,000. (*Id.* ¶ 63.) Yankowski was paid $75,000. (*Id.* ¶ 62 (deemed admitted).)

Sardina testified that she initially accepted an offer to work as an imaging producer for $45,000, but that offer was rescinded and she was forced to take a salary of $40,000, with a promise that her salary would increase to $45,000 within six months. (Lucas Decl. Ex. 7 at 1 ¶¶ 4-5.) Her salary did not reach that level until February 2004, which was approximately one month before she resigned. (*Id.* at SIRIUS XM 01412357.) Sardina also testified that, during her time working for Defendant, she worked on more radio channels than her male counterparts and repeatedly sought raises but was denied. (*Id.* at 2-3 ¶¶ 7, 12.) When she discovered that she was being paid approximately half of what her male counterparts were making, Sardina complained to her supervisor, Mitch Todd, who became angry with her and scolded her for discussing her salary with other producers. (*Id.* at 3 ¶ 17.) Sardina testified that Yankowski, who was hired shortly after she was but paid $35,000 more, had a "very limited" knowledge of Pro Tools, a program used by imagining producers for sound recording and editing. (*Id.* at 2 ¶ 14.) Sardina testified that she "helped teach him how to use Pro Tools." (*Id.*)

Plaintiff's $55,000 salary increased several times over the course of her employment with Defendant, and her responsibilities changed as well.

---

[2] Defendant argues that, for four of these individuals – Robert Taylor, Luis Torres, Raimund Kirstein, and Claude Wright – there is no information available about their 2001 salary, only their last known salary, which cannot be compared to their 2001 salary. This range therefore excludes these individuals, except for Torres, whose employment ceased on January 4, 2002, making his last known salary comparable to his 2001 salary. (*See* Def.'s Resp. 56.1 ¶ 62.)

On November 12, 2001, Plaintiff was told by Versen that she would have to work nights. (Pl.'s 56.1 ¶ 133.) Plaintiff understood that she "had no choice" in the matter. (DeLuca Dep. Tr. at 313:22-25.) However, Defendant raised Plaintiff's annual salary by 10% (by $2,000 in November 2001 and then $3,500 in August 2002) to account for her working the night shift. (Barry Decl. Ex. 29 at SIRIUS XM 0125970; *see also* Pl.'s 56.1 ¶ 121 (deemed admitted).)

In February 2003 and 2004, she received merit-based raises (of $2,420 and $2,202.20, respectively). (Barry Decl. Ex. 29 at SIRIUS XM 0125970.)

In April 2004, Plaintiff was promoted to Night Manager, which resulted in a $6,377.80 raise. (*Id.*)

In February 2005, 2006, 2007, and 2008, Plaintiff received annual merit-based raises (of $2,145, $2,761.95, $2,292.25, and $2,361.10, respectively). (*Id.*)

As of February 2008, Plaintiff's annual salary was $81,060.30. It did not change thereafter. (*Id.*)

In 2011, Plaintiff ceased to be Night Manager, but she remained on the night shift and her title was adjusted to "senior" imaging producer. (*See id.*)

Plaintiff also received bonuses in addition to her annual salary, though they have steadily decreased over the years. Since 2006 (the earliest year for which evidence about bonuses is available), Plaintiff received a bonus each year in February (other than in 2009, when no producer received a bonus). (*Id.*) In 2006, Plaintiff's bonus was $21,806.54; in 2007, it was $15,000. (*Id.*) In 2008 and 2010, it was $5,000, and in 2011 through 2016, it was $2,500. (*Id.*; *see also* Barry Decl. Ex. 30.)

Combining her salary and bonus amounts, Plaintiff's total compensation decreased from $98,213.00 in 2006 to $83,560.00 in 2011; she actually dipped down to $81,060.00 in 2009

because she received no bonus at all that year. (*See* Barry Decl. Ex. 30.) Her compensation has

remained at $83,560.00 from 2011 through 2016. (*See id.*)

This stands in contrast to Defendant's male imaging producers, whose compensation

generally increased from year to year. (*See id.*) Plaintiff is the only producer in her department

not to receive at least one compensation increase since 2011. (*Id.*) For example, Yankowski has

been paid significantly more than Plaintiff every year, despite never serving as a manager. (*See*

Barry Decl. Ex. 29 at SIRIUS XM 0125985.) Yankowski was paid $75,000 in 2001 ($20,000

more than Plaintiff) and has received an annual raise virtually every year since. (*Id.*) Although

Plaintiff was promoted to a "senior" imaging producer in 2011, that promotion did not result in a

salary increase, and her bonus for that year was actually cut in half from $5,000 to $2,500. (*See*

*id.* at SIRIUS XM 0125970.) Yankowski, by contrast, did not become a "senior" imaging

producer until 2013, at which time his salary was raised to $100,000 (approximately $19,000

more than Plaintiff was earning), and he received a $15,000 bonus that year as well. (Barry Decl.

Ex. 29 at SIRIUS XM 0125985.)

Plaintiff is not, however, the lowest-paid producer in her department. Since 2006, there

have been some male producers who have earned more and some who have earned less than she

has. In 2006, Plaintiff was the fifth-highest paid producer in the twelve-person department. In

2016, she was the ninth-highest paid out of the department's thirteen producers. Other than

Mitch Todd, who was hired as a producer shortly before Plaintiff and has headed the Music

Imaging Production Department since 2002, Plaintiff is the department's longest-serving

imaging producer.

In addition to an annual salary and bonuses, Defendant gives some of its imaging

producers nonqualified stock options ("NQOs") and restricted stock units ("RSUs"). Since 2006,

Plaintiff has been awarded shares or options only once, in 2009, when she received 13,400 RSUs. (*See* Barry Decl. Ex. 30 at 3.) Plaintiff was not awarded any stock or options from 2010 to 2016.

Again, that contrasts with Defendant's male imaging producers, some of whom received thousands of RSUs and NQOs annually. Indeed, it appears that since 2010, it has been the norm for producers to be awarded at least several thousand NQOs every year after their first or second year at the company. For example, Yankowski has received an award of stock or options (or both) every year since 2009. Between 2006 and 2016, he received a total of 29,300 RSUs and 116,380 NQOs, compared to the 13,400 RSUs awarded to Plaintiff over the same period. (*See* Barry Decl. Ex. 29 at SIRIUS XM 01400077.). All told, the stocks and options awarded to Yankowski had an accounting value of $147,252 on their respective grant dates. (*See id.*) Plaintiff's RSUs had a value of $4,958. (*See id.* at SIRIUS XM 01400074.)

## III.    Plaintiff's Performance

Defendant asserts that all imaging producer compensation decisions are determined by a producer's performance, and that any discrepancies between Plaintiff's compensation and that of her male coworkers is performance-based.

Blatter, the head of the Music Department since 2004, testified that he was responsible for setting the compensation of all music imaging producers. (*See* Blatter Dep. Tr. at 5:24-6:12, Dkt. No. 50-6.) He testified that he would make the decision to increase a producer's salary each year after discussing each individual with his direct subordinates and the human resources ("HR") department. (*Id.* at 10:07-25.) The process for determining who would be awarded stock and options was similar, with Blatter making a recommendation that would be sent to the HR department and ultimately approved by Blatter or his supervisor. (*Id.* at 144:17-145:11.)

9

In November 2002, Mitch Todd became Plaintiff's direct supervisor. (*See* Def.'s 56.1 ¶ 38.) When Blatter was hired in 2004, Todd was one of his direct subordinates who reported on employees' performance to Blatter and made recommendations about whether a compensation increase was warranted. (Blatter Dep. Tr. at 11:05-08, 11:18-20.) Sometime before 2012, Todd stopped reporting directly to Blatter, and reported instead to Darren Smith, who reported to Blatter, in order to reduce the number of individuals reporting to Blatter directly. (*Id.* at 11:21-12:24.)

Blatter testified that the key performance metrics in his decision-making process were a producer's "productivity and efficiency, and probably even more importantly, their technical abilities and their creative abilities," (*id.* at 14:19-23), as well as "interpersonal skills." (*id.* at 23:04-07.) Blatter explained that he would assess all of these metrics almost exclusively based on the "regular dialogue" he would have with his direct subordinates about the producers they supervised. (*Id.* at 19:03-20:21; 22:23-23:22.) That included, for the relevant period, Todd, Plaintiff's supervisor. (*Id.* at 19:03-20:21.) When assessing a producer's "creative abilities," Blatter testified that he would also listen to a producer's imaging "either on the channels, themselves, or through . . . packages of imaging that were provided to [him] . . . on a regular basis." (*Id.* at 20:22-21:03.)

As to Plaintiff's performance, Blatter recalled that her imaging was "flat, one dimensional, [and] did not have any real creative spark to it." (*Id.* at 159:18-19.) He testified that he relayed his concerns about her work to Todd and Darren Smith, and that this was "[p]robably five to eight or nine years ago," so between 2005 and 2011. (*Id.* at 158:14-19; *see id.* at 158:06-13.) He also testified that he saw a "lack of growth . . . in [Plaintiff's] performance from both a technical and creative perspective." (*Id.* at 166:12-16.)

Todd testified that several programmers had told him that they would prefer not to have Plaintiff be the producer assigned to their channels, even after those programmers had told Plaintiff that they liked her work. (*See* Todd Dep. Tr. at 126:05-21.) For example, Todd testified that Plaintiff told him that Reggie Hawkins wanted her to be the producer for the Hip Hop Nation channel, after hearing some audio samples she had produced. (*Id.* at 127:03-12.) When Todd approached Hawkins, Hawkins said, "[N]o, I wouldn't like her to be my producer, but perhaps she could contribute a few things to the channel." (*Id.* at 127:13-16.)

Todd also testified that he heard similar complaints about Plaintiff's work for the Groove channel in 2015, which the programmers felt lacked creativity and were of sub-par imaging quality. (*See id.* at 130:06-133:06.) This testimony is buttressed by a series of emails from the Groove's programmers discussing their complaints about Plaintiff's work and requesting a different producer be assigned to the channel. (*See* Barry Decl. Exs. 25-28.)

However, this evidence about Plaintiff's performance is rebutted, or at least undermined, by other evidence in the record – evidence that is more contemporaneous than the testimony given during this lawsuit.

From 2002 to 2008, Defendant gave written performance evaluations to the imaging producers in Plaintiff's department that included numerical scores. (Pl.'s 56.1 ¶ 122.) Each producer was scored on a variety of metrics, including satisfaction of certain objectives and possession of various behavioral and functional competencies. (*See* Lucas Decl. Ex. 29.) Those scores ranged from 1.0 (indicating performance was unsatisfactory) to 2.0 (indicating performance meets expectations) to 3.0 (indicating performance exceeds expectations). (*Id.*) Individual scores were weighted and aggregated to form an overall score. (*Id.*)

During this seven-year period, Plaintiff received scores between 2.0 and 2.51, with an average score of 2.27. (Pl.'s 56.1 ¶ 122.) This means that Plaintiff's scores fell between "Fully Meets Expectations" and "Exceeds Expectations." (*See* Lucas Decl. Ex. 29.) During this same period, Yankowski's scores, for example, ranged from a 2.0 and 2.5, with an average of 2.21. (*See* Lucas Decl. Ex. 30.) For four out of the seven years, Plaintiff had higher overall scores than Yankowski; in two of the years, their scores were identical; and in one year, Yankowski's score was higher than Plaintiff's.

Some of the evaluations also contain narrative portions. Plaintiff's evaluation completed at the end of 2005 includes a section on accomplishment of objectives. Under the objective of "Become a more diverse producer," it states, "Debby's growth has been tremendous here. She's not only soaked up new skills from multiple sources, but genuinely excited about her development in this area." (Lucas Decl. Ex. 29 at SIRIUS XM 0000348.) Under the objective of "Come up with new ideas for channels directly & indirectly responsible for," it states, "This year, for 'The Beat' she came up with several ideas which included 'The New Music Montage Sweepers', and The Beat Jingles which featured different people singing to popular songs on The Beat with the words changed to reflect the channel. She even suggested the [illegible] dance weekend on The Beat, in which she brought in her personal collection of over 200 songs to be played. Programmer feedback has been very positive." (*Id.* at SIRIUS XM 0000348-0000349.) The 2005 evaluation lists "Creative Production" as one of Plaintiff's "Strengths and Over-Performance Areas" and "Technical [S]kills" as one of her "Developmental and Performance Improvement Areas." (*Id.* at SIRIUS XM 0000350.)

In Plaintiff's review covering 2007, one of the goals listed states that Plaintiff "needs to continue to break some 'molds' that she relies on in her production. One example would be the

similar VO processing she tends to use no matter what the format (a fairly aggressive EQ'd and compressed sound)." (Lucas Decl. Ex. 24 at SIRIUS XM 0000344.)

The evaluation from May 2009 (covering the 2008 calendar year) includes an objective titled "Focus on and clearly identify what professional goals are within the company," under which it states "Yes, Debby has made it clear she would like higher profile production projects and an increase in her compensation but it is not clear to me if Debby wants to advance in management or focus on improving her production skills." (*Id.* at SIRIUS XM 0125924.) The report also characterizes Plaintiff as "a strong manager" (*id.* at SIRIUS XM 0125925), noting: "Debby has grown tremendously as a manager. When I gave her the mission to 'inspire' her reports she did." (*Id.* at SIRIUS XM 0125924.)

The May 2009 evaluation lists "Creativity" as one of Plaintiff's areas for improvement. Under that heading it states: "Debby needs to embrace her channel assignments showing an innovative perspective in producing them. She would benefit by collaborating with other producers with full awareness of what they contribute creatively. Expand her realm of influences whether it's genres of music she doesn't normally listen to or staying top of current events through the perspective of newspapers/magazines/news media she doesn't currently read/watch/listen to. Depend less on 'laurels' from terrestrial radio experience of the past, and build new ones now and in the future." (*Id.* at SIRIUS XM 0125925.)

## IV. Plaintiff's Allegations of Retaliation

In 2005, Plaintiff complained to her supervisor Todd that she was earning less in compensation than some of the producers that she supervised. (Def.'s 56.1 ¶ 69.) Plaintiff subsequently complained to Todd on an annual or semi-annual basis about her compensation between 2005 and 2012. (*Id.*) Plaintiff testified that in 2008, she "became more direct and asked Mitch Todd why it was that [she] wasn't receiving the same compensation as the people [she]

13

was managing." (DeLuca Dep. Tr. at 155:07-10.) She testified that, in response to her question, Todd stated, "Do you think it's because you're a woman?" (*Id.* at 155:11-18.)

In 2009, Plaintiff asserts that Todd began taking away Plaintiff's "creative channels" – the channels on which she felt she had the most artistic freedom – beginning with BPM. (*See* Def.'s 56.1 ¶ 70; Pl.'s Resp. 56.1 ¶ 70; DeLuca Decl. ¶ 25, Dkt. No. 68.) BPM was a dance channel "skewed towards women" that Plaintiff considered to be her "favorite" channel. (DeLuca Dep. Tr. at 172:12-173:04; 176:12-21.) Plaintiff was disappointed with this reassignment as she had received a great deal of praise for her imaging work on BPM, which is reflected in several emails from the programmer to other employees thanking Plaintiff for her hard work. (*See id.* at 174:03-176:21; DeLuca Decl. Ex. 13 (emails from programmer).) Plaintiff testified that she met with Todd multiple times in an attempt to get the channel reassigned back to her, but was unsuccessful. (DeLuca Dep. Tr. at 183:20-184:10.)

Within a few months of that reassignment, she testified that several other of her more creative channels were also reassigned to other producers without explanation. (*Id.* at 179:05-180:12.) Plaintiff testified that, on June 11, 2009, she received her 2008 performance evaluation, which she described as "more critical than in any of [her] prior reviews." (DeLuca Decl. ¶ 29, Dkt. No. 68.)

She also testified that she requested to switch to working the day shift, which would allow her greater opportunity to work on new projects with programmers who work during the day, but Todd only offered a hybrid day/night shift beginning at 2:00 p.m., which also would have required her to work in the studio with the poorest sound quality. (*See id.* ¶ 104.) Plaintiff testified that she declined that offer. (*Id.*) However, during her deposition, Plaintiff also testified

that she was offered a position on the regular day shift but declined because she did not want to have to work in the studio next to Todd. (*See* DeLuca Dep. Tr. at 330:23-332:02.)

Plaintiff also testified that, following her complaints of pay discrimination to Todd, and her complaints about Todd to HR, Todd began rejecting her work with greater frequency. (*See* DeLuca Decl. ¶¶ 51-52.) She testified that the rejections became so frequent that she had another (male) producer initial some of her work, which Todd did not reject. (*Id.* ¶ 53.) On one occasion, she pretended to incorporate Todd's criticisms of her work into a new version, but actually presented him with the original product; he proceeded to praise it. (*Id.* ¶ 54.)

Plaintiff asserts that, in mid-February 2012, she applied for a transfer to the Talk Department in order to separate herself from Todd, but that she never heard the result of her application. (*See id.* ¶ 108.)

## V.     Plaintiff's Allegations of Harassment

In addition to Plaintiff's allegations of pay discrimination, she testified that she was discriminated against based on her gender as well as her sexual orientation. She testified that she received sexist emails from Todd and other coworkers and that Todd made inappropriate comments toward her regarding her sexual orientation.

First Plaintiff asserts that Todd sent emails containing offensive language. (*See* Lucas Reply Decl. Exs. 1-B to 1-AE, Dkt. No. 83-2.) Of the emails in the record, only four are relevant here; the rest either contain nothing inappropriate or were never sent to Plaintiff (and there is no evidence that she heard about them second-hand before the start of this litigation).

On March 13, 2009, Paul Edmunds, one of Plaintiff's coworkers, sent a link to a video to a group of employees, including Plaintiff. (Lucas Reply Decl. Ex. 1-H, Dkt. No. 83-2.) Todd later replied, "Video's too long…did they end up having sex?" (*Id.*) On May 20, 2009, another coworker, Jerry Rohira, sent an email to, among others, Plaintiff, in which he included a link to

an article titled "Best Bars for Bathroom Sex." (Lucas Reply Decl. Ex. 1-E, Dkt. No. 83-2.)

Plaintiff later testified that she was not offended by the "content of [this] email," but was merely

upset that her coworkers quickly replied to it while failing to reply to her work-related email sent

earlier in the day. (DeLuca Dep. Tr. at 316:04-11.) On August 26, 2009, Todd sent an email

stating that, "I do remember there's a really nice Beef & Boobs joint in Denver ... great steaks!"

(Lucas Reply Decl. Ex. 1-B, Dkt. No. 83-2.) Plaintiff testified that she found this email "a little

offensive." (DeLuca Dep. Tr. at 307:19-21.) On October 4, 2012, another of Plaintiff's

coworkers, Heidi O'Brien, sent several people, including Plaintiff, a link to an article titled

"Steps to Instantly Make Your Day Better," to which another coworker, AJ Allen Dexter,

replied, "And here I am thinking it was gonna be pictures of boobs...oops." (Lucas Reply Decl.

Ex. 1-G, Dkt. No. 83-2.)

Second, in January 2010, after Plaintiff revealed to Todd that she planned to undergo a

hysterectomy, Todd taped an article entitled "A New Treatment to Help Women Avoid

Hysterectomy" to the console of Plaintiff's studio. (*See* Todd Dep. Tr. at 109:07-110:21.) Todd

had written "For Debby" next to the article's title. (*See* DeLuca Decl. Ex. 6, Dkt. No. 68-6 (a

copy of the article).) It is undisputed that Todd left the article for Plaintiff, but the significance of

the article is highly debated.

According to Todd, Plaintiff had approached him and voluntarily revealed her medical

condition – a fibroid tumor that she had named "Fabiola" – which would require a hysterectomy

to remove. (Todd Dep. Tr. at 108:05-18.) Todd testified that his first wife and his mother had

experienced the same health condition and that "[he] wanted [Plaintiff] to be aware that [he]

would be supportive and [he] was very concerned about her well-being." (*Id.* at 108:21-24; *see*

*id.* at 108:07-10.) Todd testified that he left the article out of concern for Plaintiff's health, and

16

followed up with her in person to tell her that he hoped the article would be helpful to her. (*See* Todd Dep. Tr. at 109:10-24.) Defendant also notes that, after the surgery, Plaintiff discussed her hysterectomy on Facebook and that Plaintiff is friends on Facebook with many of her coworkers. (*See* Barry Decl. Ex. 34, Dkt No. 50-14 (Plaintiff's Facebook comment indicating she had a "partial hyst"); DeLuca Dep. Tr. at 21:13-27:06 (admitting that many of her coworkers are friends on Facebook and thus could view this comment).) Defendant asserts that Plaintiff could not have considered the information confidential if she later discussed it publicly in a forum visible to many of her coworkers.

Plaintiff interpreted Todd's actions quite differently. She testified that she was quite reluctant to even tell Todd about the nature of her medical procedure, and only admitted to him that it was a hysterectomy after "he kept pressing" her to tell him what the procedure was. (DeLuca Dep. Tr. at 212:14-19.) She also testified that she told him "to please keep that [information] confidential," and that she never told anyone else at the company about the procedure. (*Id.*) Plaintiff testified that she found out about the article that Todd had left because another coworker, Jerry Rohira, approached her and asked her, "So when are you having a hysterectomy?" (*Id.* at 215:05-16). Plaintiff testified she was "mortified" when Rohira asked her this and pointed to the article that Todd had left for her. (*Id.* at 215:17-24.) Two other coworkers asked her later in the week when she was leaving for her hysterectomy. (*Id.* at 215:24-216:03.) Plaintiff testified that she did not know why Todd had left her the article but she did not believe it was out of concern for her health. (*Id.* at 216:14; 218:02-03.) She speculated that he left the article as a form of discrimination or in retaliation for her complaining about unequal pay, stating that, "he didn't do it to the men. Men didn't get anything about vasectomies . . . taped to their door." (*Id.* at 216:18-20.) She testified that her hysterectomy then became a "subject of

17

conversation in the otherwise all-male Department," forcing Plaintiff to mask her discomfort and delay her surgery by approximately a year out of embarrassment. (DeLuca Decl. ¶¶ 70-71, Dkt. No. 68.)

In addition to this incident and the allegedly inappropriate emails, Plaintiff testified that Todd made inappropriate remarks regarding her sexual orientation.

In the spring of 2009, Plaintiff testified that, during a work meeting, in the context of a conversation with Todd about sports, she stated that she did not like sports, to which Todd responded, "What kind of dyke are you?" (Def.'s 56.1 ¶ 74.) Plaintiff testified she felt "humiliated" by the comment, which was made in the presence of another coworker. (DeLuca Dep. Tr. at 198:04-199:08.) When the other coworker responded, "Whoa," Todd stated, "Well, what's the big deal? My brother is gay." (*Id.* at 198:21-199:02.) Plaintiff testified that Todd also described his brother as a "faggot" in the course of that conversation. (*Id.* at 218:20-24.) Todd testified that he did not recall ever using the word "dyke" to refer to Plaintiff. (Todd Dep. at 97:09-13.)

After encouragement from the coworker who witnessed the incident, Plaintiff testified that she approached Stefanie Harris in Defendant's HR department about the comment, hoping that it would result in Todd being sent to sensitivity training. (Def.'s 56.1 ¶ 75.) Harris spoke to Todd regarding the comment. (*Id.* ¶ 76.) Shortly after that, Todd apologized to Plaintiff, although Plaintiff testified that he appeared angry and that she did not believe his apology to be sincere. (*Id.* ¶ 77; DeLuca Dep. Tr. at 202:08-203:15.) Plaintiff did not hear him use the work "dyke" again, although she testified that he made "other homophobic comments." (DeLuca Dep. Tr. at 203:16-21.)

Approximately two weeks after Plaintiff's complaint to HR and Todd's apology, Plaintiff testified that she was in Todd's studio when he stated that another female lesbian employee was out for a few weeks, "probably due to her having a sex change." (DeLuca Dep. Tr. at 208:02-07.) Plaintiff reported this conversation to Harris as well. (*Id.* at 209:14-24.)

In another incident, Plaintiff testified that she invited a friend of hers to record a jingle for one of her channels, and during the recording session Todd entered the studio and stated, "This promo is gay." (*Id.* at 210:09-211:08.) Plaintiff testified that she felt "humiliated" and "embarrassed" by the comment, which was made in the presence of her friend, who was not an employee of Defendant. (*Id.* at 211:18-25.)

Plaintiff also testified that she had heard a similar story from another gay coworker. Tom Yankowski, the other gay producer in the department, told her that he had heard Todd state, in reference to Darren Smith, his direct supervisor who is gay, "Faggots like that give people like you a bad name." (*Id.* at 219:08-220:02.) Plaintiff testified that Yankowski told her he was struggling over whether to report the incident to HR because "he saw what happened to [Plaintiff], so he didn't want to be retaliated against." (*Id.* at 219:10-220:02.) Plaintiff did not know whether Yankowski ever reported the incident. (*Id.* at 220:03-10.) Plaintiff could not recall in what year this conversation took place. (*Id.* at 219:08-11.)

In early February 2012 – only days after Plaintiff filed her initial discrimination claim against Defendant with the New York State Division of Human Rights ("NYDHR") that later formed the basis of this lawsuit – Plaintiff was assigned by Todd to produce a recording of a comedic roast of musician Zakk Wylde hosted by Sharon Osbourne. (DeLuca Dep. Tr. at 294:15-22.) Plaintiff said she was instructed to "add laughter to the jokes" on the recording because Todd said "there wasn't enough." (*Id.* at 295:08-11; 297:17-23.) Plaintiff testified that,

when she listened to the recording, the audience reaction was perfectly audible. (*Id.* at 300:03-06.) Plaintiff testified that the recording included "A lot of gay jokes," and that she recalled "there being an overabundance [of jokes] directed towards gays, lesbians, or homosexual acts." (*Id.* at 301:11-21.) The jokes to which Plaintiff testified she was instructed to add laughter included numerous uses of the words "dyke," "fag," and "faggot." (*See* DeLuca Decl. ¶ 98 n.1, Dkt. No. 68.) Plaintiff testified that, after completing the assignment as instructed, she brought the assignment to the attention of HR, believing it to be retaliation for filing her complaint with the NYDHR. She was never given a similar assignment again.

Plaintiff testified that her work experience had a negative impact on her mental health. Beginning in 2009, as she realized she was not being paid or treated equally to her coworkers, she testified that she became depressed. (*See* DeLuca Dep. Tr. at 225:18, 226:15-19.) She testified that she saw a psychiatrist, who prescribed Zoloft and Xanax because she was experiencing panic attacks. (*Id.* at 227:18-23.) She ultimately stopped taking Zoloft after approximately a year. (*Id.* at 235:17-18.) She also experienced extreme heartburn due to stress, for which she was prescribed medication in approximately 2010. (*Id.* at 237:14-239:06.) She testified that she regularly saw a psychologist for mental health treatment until approximately 2011, when she testified she had to stop treatment because she could no longer afford it. (*Id.* at 239:07-244:22.)

**Procedural History**

On January 20, 2012, Plaintiff filed a complaint with the NYDHR alleging unlawful discrimination on the basis of sex and sexual orientation and retaliation, in violation of state and federal law. (*See* June 21, 2017 Letter from Scott Lucas ("Lucas Letter") Ex. 1, Dkt. No. 94-1.) NYDHR cross-filed that complaint with the federal Equal Employment Opportunity Commission ("EEOC"). After initially issuing a finding of no probable cause, NYDHR reopened Plaintiff's

complaint on August 24, 2012, and then dismissed her claims for administrative convenience on September 21, 2012. (*See* Lucas Letter Ex. 2, Dkt. No. 94-2.) The EEOC issued Plaintiff a right to sue notice on October 8, 2012. (Lucas Letter Ex. 3, Dkt. No. 94-3.)

On November 13, 2012, Plaintiff filed her complaint in this Court alleging eleven different causes of action relating to allegations of gender and sexual-orientation discrimination arising out of her employment at Defendant. The case was assigned to my colleague, the Hon. Thomas P. Griesa. Plaintiff amended her complaint on December 9, 2014.

Count One of the amended complaint asserts a claim of gender discrimination under Title VII. Counts Two and Three assert claims of gender and sexual-orientation discrimination in violation of NYCHRL and NYHRL, respectively. Counts Four and Five assert equal pay claims under the EPA and NYEPA, respectively. Counts Six, Seven, Eight, and Nine allege claims of retaliation in violation of Title VII, NYCHRL, NYHRL, and NYLL, respectively. Counts Ten and Eleven allege claims of unpaid overtime in violation of the FLSA and NYLL, respectively.

On May 27, 2016, Judge Griesa granted Plaintiff's motion to compel Defendant to produce information regarding the compensation of potential comparator producers from 2001 to 2016, even though that timeframe included dates outside of the limitations period – that is, prior to 2006. (Dkt. No. 34.) Judge Griesa concluded that the information was likely relevant to Plaintiff's equal pay claims alleging that she was paid less than her male counterparts beginning when she was first hired as a producer in 2001 and that the pay disparity was never corrected.

On September 1, 2016, Defendant moved for summary judgment dismissing all of Plaintiff's claims (Dkt. No. 45), and Plaintiff moved for partial summary judgment on her equal pay claims only (Dkt. No. 51).

On May 17, 2017, this case was re-assigned to me.

## Discussion

### I.     Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Anderson*, 477 U.S. at 248. In making its determination, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255.

To defeat summary judgment, it is not sufficient for the nonmoving party to present evidence that is conclusory or speculative, with no basis in fact. *See Anderson*, 477 U.S. at 249-50. Instead, the nonmoving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529 (2006). "Summary judgment is designed . . . to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

Courts should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question," because "direct evidence of an employer's discriminatory intent will rarely be found." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

## II.     Plaintiff's Gender Discrimination Claims

Counts One, Two, and Three of Plaintiff's amended complaint assert that Defendant's conduct constituted gender discrimination in violation of Title VII, NYCHRL, and NYHRL, respectively.

### A.     Legal Standards

Claims of gender discrimination under Title VII and NYHRL are governed by the familiar burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Varughese v. Mount Sinai Med. Ctr.*, No. 12 Civ. 8812, 2015 WL 1499618, at *38 (S.D.N.Y. Mar. 27, 2015).

Under the *McDonnell Douglas* framework, the plaintiff first bears the burden of establishing a prima facie case of discrimination, a burden which the Supreme Court has described as "minimal," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993), and "not onerous," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To meet this burden, the plaintiff must establish "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002) (citing *McDonnell Douglas*, 411 U.S. at 802). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254.

At the second stage of the *McDonnell Douglas* framework, "the presumption created by the prima facie case places upon the defendant the burden of producing an explanation to rebut the prima facie case—i.e., the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128-29 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Hicks*,

23

509 U.S. at 506-07). While the defendant bears the burden of *production* in the second stage of the analysis, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 129 (internal quotation marks omitted) (quoting *Hicks*, 509 U.S. at 507).

If the defendant meets its burden of production, the presumption of discrimination established by the prima facie case is rebutted, and the plaintiff must, in the third step of the analysis, "demonstrate that the proffered reason was not the true reason for the employment decision—a burden that merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* (internal quotation marks omitted) (quoting *Burdine*, 450 U.S. at 256).

Claims under NYCHRL must be reviewed separately and independently from parallel discrimination claims brought under state and federal law. *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015). Under NYCHRL, a plaintiff can prevail on a gender discrimination claim if she can prove "by a preponderance of the evidence that she has been treated less well than other employees because of her gender." *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 78 (1st Dep't 2009). This is a "more limited burden" than required under Title VII and NYHRL. *Waters v. Gen. Bd. of Glob. Ministries*, 769 F. Supp. 2d 545, 557 (S.D.N.Y. 2011).

**B.     Plaintiff's Prima Facie Case**

Here, there is no dispute that several elements of Plaintiff's prima facie case have been established. Plaintiff was Defendant's only female imaging producer working in her department between 2004 and present. She is a member of a protected class. Plaintiff was otherwise qualified for her position as an imaging producer, which she held for more than ten years before initiating this lawsuit.

24

The parties dispute whether Plaintiff suffered an "adverse employment action" and whether she did so under circumstances supporting an inference of discrimination. Plaintiff has predicated her gender discrimination claims on three alleged adverse employment actions, each of which must be addressed separately: (1) reassignment of her "creative" channels; (2) unequal compensation; and (3) denial of her request to transfer to the day shift.

### 1. Channel Reassignment

First, Plaintiff asserts that, starting in 2009, she was reassigned to work on less "creative" channels, and that this constituted an adverse employment action.

An "adverse employment action" under the federal discrimination laws is generally characterized as a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted) (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)). "It may include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'" *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (quoting *Galabya*, 202 F.3d at 640).

A change in workplace responsibilities may have an adverse impact on the terms and conditions of employment if the employee experiences "an increase in workload and location-specific stress," is given "different job responsibilities," is "no longer eligible for promotion opportunities," or is moved from a position "which provided prestige and opportunity for advancement, to a less prestigious unit with little opportunity for professional growth." *Pimentel v. City of New York*, No. 00 Civ. 326, 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002), *aff'd*, 74 F. App'x 146 (2d Cir. 2003) (internal footnotes and citations omitted).

Whether Plaintiff's reassignment to less "creative" channels significantly diminished her material responsibilities is a question of fact that must be determined by the jury. *See Davidson v. City of N.Y.*, No. 10 Civ. 4938, 2011 WL 2419887, at *3 (S.D.N.Y. June 7, 2011). According to Plaintiff's testimony, by placing her on channels that had less creative flexibility, Defendant limited her ability to demonstrate her talents and restricted her opportunities for advancement. These actions, under the circumstances, may qualify as adverse for purposes of Plaintiff's discrimination claims if Plaintiff can demonstrate that the reassignment constituted a move from a position which provided opportunities for professional growth to one with limited chance for advancement. *Pimentel*, 2002 WL 977535, at *3.

Furthermore, Plaintiff has also presented sufficient evidence to allow a rational juror to conclude that an inference of discrimination exists as to her alleged channel reassignment. Such an inference may be established by, *inter alia*, evidence that employees not within the plaintiff's protected group were treated more favorably. *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015). It is undisputed that every one of the department's other employees from 2004 onward was male, meaning that every time one of Plaintiff's preferred channels was reassigned, it was reassigned to a male producer.

As Plaintiff has raised genuine issues of material fact regarding whether her channel assignment constitutes an adverse employment action under Title VII and NYHRL, she has likewise raised questions of fact as to whether she was treated "less well" than her male coworkers under the more lenient NYCHRL standard.

### 2. Unequal Compensation

Second, Plaintiff has testified that, since the time she was first hired in 2001, she was paid less than her male counterparts, and that, since 2010, she has not been given a raise despite annual raises being the norm for the department. Plaintiff introduced evidence establishing that,

in 2001, every female producer was paid less than every male producer in her department, regardless of how long they were employed with the company. She also introduced evidence showing that, between 2006 and 2016, she received only one raise in her total compensation, which was in 2010. That raise followed three straight years of total compensation reductions, and only restored her compensation to the level that it was at in 2008. She is the only producer in the department to have received no raise from 2010 to 2016, and most other producers have received raises annually.

The failure to provide a pay raise may constitute an adverse employment action under circumstances where a raise is warranted or customary. *See Fullwood v. Ass'n for the Help of Retarded Children, Inc.*, No. 08 Civ. 6739, 2010 WL 3910429, at *6 (S.D.N.Y. Sept. 28, 2010). Certainly, *reducing* an employee's compensation or paying an employee less than others simply because of her gender would also qualify as separate adverse employment actions. *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006). Likewise, such actions, if proved, would satisfy the more limited burden under NYCHRL of showing that Plaintiff was treated "less well" than Defendant's male employees.

The record is also sufficient to allow a reasonable juror to draw an inference of discrimination regarding Plaintiff's compensation. Most of the department's male producers received annual raises while Plaintiff did not. This includes Yankowski, who received similar or slightly lower performance ratings than Plaintiff between 2002 through 2008, the only years in which Defendant engaged in a numerical evaluation of imaging producer performance. Despite similar performance reviews, Yankowski earned a higher salary and a higher overall level of compensation (once bonuses and stock options are accounted for) than Plaintiff in each and every year between 2002 and 2008.

### 3.  Day Shift Transfer

Third, Plaintiff's final alleged adverse employment action is a denial of a transfer to the day shift.

A denial of a request to transfer shifts can constitute an adverse employment action if the requested shift presented greater opportunities for advancement, more overtime, or was considered more prestigious. *Stalter v. Bd. of Co-op. Educ. Servs. of Rockland Cty.*, 235 F. Supp. 2d 323, 332 (S.D.N.Y. 2002). On the other hand, "lateral transfers or shift changes without a loss of pay or other material changes in working conditions do not constitute an adverse employment action." *Booker v. Fed. Reserve Bank of New York*, No. 01 Civ. 2290, 2003 WL 1213148, at *11 (S.D.N.Y. Mar. 17, 2003).

Here, Plaintiff testified that, because most of the programmers on the company's more prestigious channels worked during the day, her night shift position gave her fewer occasions to interact or collaborate with those individuals, further reducing her chance of a future promotion or pay raise. However, Plaintiff was not actually *denied* the opportunity to work during the day shift. She testified that she asked Todd for a transfer to the day shift but was only offered a hybrid day/night shift, which she declined because it would have required her to work in a studio she considered to have poor sound quality. She also later testified, after reviewing her contemporaneous notes, that she was proactively offered a spot on the day shift but declined because it would have been in the studio next to Todd.

Obviously, where a plaintiff was not actually denied a specific workplace opportunity – for example, by failing to apply for a particular promotion – the plaintiff cannot establish that she suffered an adverse employment action. *See Sethi v. Narod*, 12 F. Supp. 3d 505, 526-27 (E.D.N.Y. 2014) (collecting cases). Here, Plaintiff was admittedly given two opportunities to work during the day shift – once partly (day-night shift) and once fully – and she declined both,

even though she acknowledges that these would have allowed her to interact with more prestigious programmers and advance in her career. (*See* DeLuca Dep. Tr. at 314:05-14, 331:07-332:02.) As Plaintiff admitted that she was offered (more than once) the opportunity to transfer to a full or partial day shift, but voluntarily declined to do so, she cannot establish an adverse employment action based on being "denied" such an opportunity.

Furthermore, Plaintiff also cannot establish circumstances giving rise to an inference of discrimination related to this shift change. Plaintiff has identified no male employee who requested to move to the day shift and received that opportunity instead of her. She has not pointed to any other evidence that would indicate discriminatory animus connected with this specific decision. There is nothing in the record to indicate that this decision resulted in Plaintiff's being treated "less well" than any male coworker, which fails to satisfy the more lenient standard under NYCHRL.

Accordingly, the portions of Plaintiff's gender discrimination claims in Counts One, Two, and Three that are predicated on her being denied a transfer to the day shift are dismissed.

### C.     Defendant's Proffered Non-Discriminatory Reason

Defendant responds that, even if Plaintiff can establish a prima facie case as to her alleged unequal compensation and channel reassignments, it has shown that Plaintiff's compensation and channel assignments were determined based on her performance, which is a legitimate, non-discriminatory reason for its decisions. On this point, however, Plaintiff has raised triable issues of fact.

Although Plaintiff's compensation was ultimately set by Blatter, who supervised Plaintiff's immediate supervisor, Todd, Blatter's decisions were, at least in part, influenced by Todd's recommendations and his evaluations of Plaintiff's performance. (Def.'s 56.1 ¶ 63.) Furthermore, Defendant asserts that the primary criteria for determining an imaging producer's

compensation are "the individual's creative and technical skills." (*Id.* ¶ 61.) An assessment of a producer's "creativity" is an inherently subjective evaluation and Todd himself acknowledged in an email to another producer that the process of evaluating producers' work is "HIGHLY subjective." (DeLuca Decl. Ex. 27, Dkt. No. 68-27 (capitalization in original).)

Subjective evaluations, standing alone, are not adequate legitimate non-discriminatory reasons for employment decisions "because they may mask prohibited prejudice." *Sweeney v. Research Found. of State Univ. of N.Y.*, 711 F.2d 1179, 1185 (2d Cir. 1983). While there is nothing unlawful about an employer using some subjective criteria when making its determinations, *Byrnie v. Town of Cromwell Pub. Sch.*, 73 F. Supp. 2d 204, 213 (D. Conn. 1999), *aff'd in part, rev'd in part sub nom. Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93 (2d Cir. 2001), "an employer may not use wholly subjective and unarticulated standards to judge employee performance." *Knight v. Nassau Cty. Civil Serv. Comm'n*, 649 F.2d 157, 161 (2d Cir. 1981).

The only evidence of a numerical evaluation of Plaintiff's performance covers the years 2002 through 2008, and during those years she performed adequately on all metrics, and had stronger average scores than Yankowski, her male coworker who earned a higher salary. Defendant has produced no written evaluations of Plaintiff's work since 2008, making it difficult to assess whether there is a record of some change in her performance during that period. Therefore, outstanding questions of fact remain regarding whether Defendant's evaluations were sufficiently objective and specific to warrant the decisions made about Plaintiff's compensation, and thus whether Defendant has met its burden of production.

As to Plaintiff's reassignments, it is again unclear whether Defendant has produced a sufficiently objective non-discriminatory reason to rebut Plaintiff's claims. Todd was the

supervisor responsible for determining Plaintiff's channel assignments and the individual who reassigned her "creative" channels to other producers. Defendant has proffered no evidence of the objective criteria that Todd used to make these decisions, other than a few emails from disgruntled programmers on the Groove channel from 2015, which was approximately six years *after* Plaintiff testified that her channels began to be reassigned. Genuine issues of material fact remain as to whether Defendant has met its burden of production sufficient to defeat Plaintiff's prima facie case under Title VII and NYHRL.

Genuine disputes also exist regarding Plaintiff's gender discrimination claims under NYCHRL. There are outstanding factual questions about whether Plaintiff was treated "less well" in terms of her compensation and channel assignments, and whether that treatment was on account of her gender.

Defendant's motion for summary judgment dismissing Plaintiff's gender discrimination claims is GRANTED IN PART only as to claims predicated on Plaintiff's request to transfer to the day shift, and is otherwise DENIED.

### III.   Plaintiff's Sexual-Orientation Discrimination Claims

When Plaintiff commenced this lawsuit, it was clear, in this Circuit as elsewhere, that no claim for sexual-orientation discrimination existed under federal law. *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005). That has recently been called into question. *See Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201-07 (2d Cir. 2017) (Katzmann, C.J., concurring) (concluding that *Dawson* should be overruled) (motion for rehearing en banc pending). However, this development, presaged by the Seventh Circuit's opinion in *Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 351 (7th Cir. 2017) (en banc) (concluding that sexual-orientation discrimination is a form of sex discrimination protected by Title VII), did not

come in time for Plaintiff to assert a federal claim for sexual-orientation discrimination. She did, however, assert such a claim under state and local law.

Both the NYSHRL and the NYCHRL protect employees against sexual-orientation discrimination in the workplace. N.Y. Exec. Law § 296(1)(a); N.Y.C. Code § 8-107(1)(a). Like all other NYSHRL claims, Plaintiff's state-law sexual-orientation discrimination claim is subject to the burden-shifting framework borrowed from Title VII used to evaluate her gender discrimination claims. *Rohn Padmore, Inc. v. LC Play Inc.*, 679 F. Supp. 2d 454, 460 (S.D.N.Y. 2010); *Hargett v. N.Y. City Transit Auth.*, 640 F. Supp. 2d 450, 474 (S.D.N.Y. 2009), *aff'd sub nom. Hargett v. Metro. Transp. Auth.*, 381 F. App'x 12 (2d Cir. 2010).

Plaintiff's sexual-orientation discrimination claim under NYCHRL, like her gender discrimination claim, must be analyzed "separately and independently" from her claim under state law. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013); and the Court must construe NYCHRL's provisions "broadly in favor of [Plaintiff], to the extent that such a construction is reasonably possible." *Id.* (internal quotation marks omitted) (quoting *Albunio v. City of N.Y.*, 16 N.Y.3d 472, 477-78 (2011)).

Plaintiff points to the same alleged adverse employment actions that form the basis of her gender discrimination claims to support her sexual-orientation discrimination claims. That is, she asserts she was discriminated against in terms of her compensation, channel assignments, and by denying her request to transfer to the day shift.

As discussed above, Plaintiff's allegation of unequal compensation certainly qualifies as an adverse employment action under NYHRL, and her allegedly inferior channel assignments may qualify as adverse employment actions under the circumstances. The "denial" of her request to move to the day shift does not constitute an adverse employment action because she

voluntarily declined the opportunity to move to that shift, according to her own testimony. That "denial" cannot even establish the basis of a claim under NYCHRL, as there is no evidence that Plaintiff was treated "less well" than any other employee by being offered and voluntarily declining the opportunity to move to the day shift.

Defendant asserts that Plaintiff cannot establish the fourth element of her prima facie case – "circumstances that support an inference of discrimination" on the basis of sexual orientation, *Swierkiewicz*, 534 U.S. at 510, and therefore her claim under NYHRL should be dismissed.

"An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's . . . invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group . . . .'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). As the Second Circuit has explained, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007). Specifically, courts look to factors including (1) whether the remarks were made by the relevant decision-maker or another employee; (2) whether the remark "evinces a discriminatory state of mind"; and (3) whether the remark closely relates to the alleged discriminatory behavior under the circumstances. *Id.* at 115-16.

In support of her gender discrimination claims, Plaintiff offered evidence that her male coworkers were treated more favorably in terms of their compensation and channel assignments than Plaintiff, and so satisfied the fourth element of her prima facie case through evidence of more favorable treatment of employees not in her protected group. In support of her sexual

orientation-based claims, however, Plaintiff has presented no evidence indicating that heterosexual employees were treated more favorably than homosexual employees. Indeed, Yankowski, another gay employee, was compensated in line with other producers in the department. Instead, Plaintiff points only to her supervisor's "invidious comments" in an attempt to establish circumstances supporting an inference of discrimination.

But the evidence of "invidious comments" that Plaintiff has introduced does not establish the fourth prong of her prima facie case.

Plaintiff testified that, in one 2009 conversation, her supervisor Todd called her a "dyke" and later referred to his own brother as a "faggot." In a conversation of unknown date, Todd disparagingly referred to one of Plaintiff's promos as "gay." Plaintiff testified that, in early 2012, she was assigned by Todd to add laughter to a Zakk Wylde comedy roast that was filled with anti-gay jokes, which repeatedly used the words "dyke," "fag," and "faggot."

Defendant disputes that Todd made any such comments, but also asserts that, if made, they are the type of "sporadic and ambiguous comments unconnected" to the alleged adverse employment action that are insufficient to show discriminatory animus. *Maqsood v. Bell Sec., Inc.*, 249 F. App'x 229, 230 (2d Cir. 2007). Defendant does not dispute that Plaintiff was assigned to produce the comedy roast, but argues that the roast was filled with off-color jokes of all types, and did not specifically target Plaintiff's sexual orientation. Regardless, Defendant argues, none of these actions was related to Plaintiff's compensation, and there is no evidence connecting any of them to her being transferred off of her preferred channels.

Here, while the derogatory remarks were allegedly made by Todd, Plaintiff's direct supervisor, there is no evidence connecting them to any of the discriminatory behavior. Todd's 2009 reference to Plaintiff as a "dyke" was reportedly made during a discussion about sports that

34

had nothing to do with Plaintiff's work or compensation. The other remark, that one of her promos was "gay," was made at an unknown date, and was not made in the context of a conversation about Plaintiff's compensation or channel assignments. Furthermore, Plaintiff's compensation was ultimately set by Blatter in conjunction with the HR department, and since 2012 Todd has provided input on her compensation only indirectly through his supervisor Darren Smith, who is also gay. The 2012 assignment to edit the Zakk Wylde roast, even if it could be construed as a "comment" by Todd, also bears no causal relationship to the compensation and channel assignment decisions that were made more than three years earlier. The record is clear that any "invidious comments" made by Todd about Plaintiff's sexual orientation lack the required "causal nexus" to the alleged adverse employment actions and therefore "qualify only as stray remarks." *Woodard v. TWC Media Sols., Inc.*, No. 09 Civ. 3000, 2011 WL 70386, at *7 (S.D.N.Y. Jan. 4, 2011), *aff'd sub nom. Lawless v. TWC Media Sols., Inc.*, 487 F. App'x 613 (2d Cir. 2012).

Plaintiff's sexual-orientation discrimination claim under NYCHRL also does not survive, even when reviewing the record in light of that statute's "uniquely broad and remedial purposes." *Williams*, 61 A.D.3d at 79. Simply put, Plaintiff has introduced no evidence whatsoever indicating that she or other gay employees were treated "less well" in terms of their channel assignments or compensation than their heterosexual coworkers.

Defendant's motion for summary judgment dismissing Plaintiff's sexual-orientation discrimination claims is, therefore, GRANTED.

## IV.    Plaintiff's Hostile Work Environment Claims

The amended complaint asserts that Counts One, Two, and Three incorporate claims of creation of a hostile work environment on account of Plaintiff's gender and sexual orientation. (*See* Am. Compl. ¶ 274.)

## A.      Legal Standards

To establish a claim of gender discrimination based on a hostile work environment under Title VII, a plaintiff must prove (1) the existence of workplace harassment directed toward her because of her gender, (2) that such harassment is "objectively severe or pervasive" – that is, the conduct creates an environment that a reasonable person would find hostile or abusive, and (3) that she subjectively perceived her work environment as hostile or abusive. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (internal quotation mark omitted). Whether a workplace environment is objectively hostile or abusive is determined by an evaluation of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

The "core substantive standards" from Title VII hostile work environment claims apply to gender-based and sexual-orientation-based hostile work environment claims asserted under NYHRL, *Sanchez-Vazquez v. Rochester City Sch. Dist.*, 519 F. App'x 63, 64 (2d Cir. 2013), so the analysis of Plaintiff's state law hostile work environment claims is the same as under federal law.

To establish a hostile work environment claim under NYCHRL, a plaintiff need only show that she has been treated "less well" because of her gender or sexual orientation, which, as discussed above, is a "more limited burden" than under the parallel state and federal standards. *Waters*, 769 F. Supp. 2d at 557. However, the NYCHRL is not intended to operate as a "general civility code," and the law recognizes "an affirmative defense whereby defendants can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'"

36

*Williams*, 61 A.D.3d at 80. However, discrimination claims brought under the NYCHRL must be evaluated considering "the totality of the circumstances," *Hernandez v. Kaisman*, 103 A.D.3d 106, 110 (2012), and, therefore, even "a single comment that objectifies women," if "made in circumstances where that comment would, for example, signal views about the role of women in the workplace[,] [may] be actionable." *Williams*, 61 A.D.3d at 80 n.30.

### B.    Plaintiff's Gender Claims

Plaintiff's gender-based hostile work environment claims are largely based on the emails she received from Todd and other coworkers as well as the January 2010 incident involving the hysterectomy article. Viewing these facts together in the light most favorable to Plaintiff, a jury could reasonably conclude that this conduct – in particular, the posting of the hysterectomy article – was sufficiently objectively and subjectively severe or pervasive to interfere with Plaintiff's "ability to do her job." *Rubin v. Abbott Labs.*, No. 13 Civ. 8667, 2015 WL 5679644, at *8 (S.D.N.Y. Sept. 23, 2015).

"[T]he disclosure of an individual's sensitive medical information might," under certain circumstances, "constitute discrimination so severe as to 'work a transformation of the plaintiff's workplace.'" *Christiansen v. Omnicom Grp., Inc.*, 167 F. Supp. 3d 598, 614 (S.D.N.Y. 2016), *aff'd in part, rev'd in part*, 852 F.3d 195 (2d Cir. 2017); *accord De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 645 (S.D.N.Y. 2011) ("Moreover, a single event, if severe enough, can be sufficient to establish the existence of a hostile work environment."). For example, in *Liparulo v. Onondaga Cent. Sch. Dist.*, No. 5:06 Civ. 1068, 2009 WL 3790187, at *5 (N.D.N.Y. Nov. 12, 2009), the court denied summary judgment in part based on evidence that the defendant had "revealed confidential information about [the plaintiff] to certain male employees."

Here, Plaintiff testified that she was "mortified" when she learned that Todd had revealed to her coworkers that she was preparing to undergo a hysterectomy, private medical information

that she testified that she had specifically asked him to keep confidential. She testified that she was forced to discuss the procedure with numerous male coworkers after Todd posted the article in the office, and that she subsequently delayed the procedure for months out of embarrassment. While this incident was not physically threatening, a jury could reasonably conclude that this experience was sufficiently severe and humiliating so as to negatively impact Plaintiff's work experience. In making this evaluation, the Court is mindful that, "An Article III judge is not a hierophant of social graces and is generally in no better position than a jury to determine when conduct crosses the line between boorish and inappropriate behavior and actionable [discrimination]." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001)).

As Plaintiff has introduced sufficient evidence to support her gender-based hostile work environment claims under Title VII and NYHRL, she has, necessarily, proffered sufficient evidence to meet her "more limited burden" under NYCHRL. *Waters*, 769 F. Supp. 2d at 557.

Accordingly, Defendant's motion for summary judgment dismissing Plaintiff's gender-based hostile work environment claims is DENIED.

### C.    Plaintiff's Sexual-Orientation Claims

Plaintiff's sexual-orientation hostile work environment claims are supported by several incidents in which Todd allegedly used harassing or demeaning language to describe Plaintiff and her gay coworkers. Todd, as discussed, denies that he used such language. For example, Plaintiff testified that Todd called her a "dyke" and his own brother a "faggot" in a 2009 conversation. She testified that Yankowski once told her that Todd also used the word "faggot" to describe his supervisor Darren Smith, and that he disparaged one of her jingles as "gay" in

front of a friend doing a voice recording. Finally, she asserts that she was assigned to add laughter to anti-gay jokes in the Zakk Wylde roast in early 2012.

That some of these comments may have been made outside of the limitations period does not necessarily bar Plaintiff's claims. As her sexual-orientation hostile work environment claims are brought under NYHRL and NYCHRL, they are subject to a three-year statute of limitations, *Bonner v. Guccione*, 178 F.3d 581, 584 (2d Cir. 1999); *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 573 (S.D.N.Y. 2011); *Acosta v. Loews Corp.*, 276 A.D.2d 214, 217 (1st Dep't 2000), which was tolled while Plaintiff's complaint was pending with the NYDHR, *Pan Am. World Airways, Inc. v. N.Y. State Human Rights Appeal Bd.*, 61 N.Y.2d 542, 549 (1984), and therefore only acts that occurred after March 12, 2009 would be inside the limitations period. However, "Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993)). By their very nature, hostile work environment claims "involve[] repeated conduct," and thus are subject to the continuing violation doctrine. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Therefore, even incidents that occurred prior to March 12, 2009 could be actionable, as Plaintiff has alleged at least one incident that is within the limitations period. Indeed, the latest incident, having to add laughter to anti-gay jokes in the Zakk Wylde roast, occurred in 2012 – after Plaintiff had already filed her complaint with the NYDHR.

The fact that Plaintiff may have learned of Todd's comments regarding Smith second-hand through Yankowski does not necessarily make those comments irrelevant to the analysis, *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997), although they may be "less persuasive," *Woodard v. TWC Media Sols., Inc.*, No. 09 Civ. 3000, 2011 WL 70386, at *12 (S.D.N.Y. Jan. 4, 2011), *aff'd sub nom. Lawless v. TWC Media Sols., Inc.*, 487 F. App'x 613 (2d Cir. 2012). Offensive comments heard second-hand can also impact the work environment. *Schwapp*, 118 F.3d at 116. "[A]n employee who knows that her boss is [making offensive comments] behind her back may reasonably find her working environment hostile." *Torres v. Pisano*, 116 F.3d 625, 633 (2d Cir. 1997).

Viewing the evidence introduced by Plaintiff under all of the circumstances, while the alleged comments were certainly offensive, no reasonable jury could conclude that they were "objectively severe or pervasive" such that Plaintiff could prevail on her NYHRL claim. In *Bolden v. New York Hous. Auth.*, No. 96 Civ. 2835, 1997 WL 666236, at *2 (S.D.N.Y. Oct. 27, 1997), the court determined that "five racial references over a period of six weeks" by the defendant – including at least one use of the word "niggers" – was insufficient to sustain a hostile work environment claim under Title VII. Similarly, the court in *De La Concha v. Fordham Univ.*, 5 F.Supp.2d 188, 194 (S.D.N.Y. 1998), *aff'd*, 173 F.3d 843 (2d Cir. 1999), concluded, on a motion to dismiss, that allegations that a supervisor used the word "spic" and made other racial slurs in the plaintiff's presence was not "harassment severe or pervasive enough to meet his prima facie case" under Title VII. In *Lane v. Collins & Ailman Floorcoverings, Inc.*, No. 00 Civ. 3241, 2001 WL 1338918, at *5 (S.D.N.Y. Oct. 31, 2001), the court dismissed hostile work environment claims where the plaintiff witnessed "at least six incidents where homophobic statements, gestures or both were made in his presence" over the

course of approximately two years, concluding that the conduct was not sufficiently "severe or pervasive."

While the evidence is not sufficient to sustain a sexual-orientation hostile work environment claim under state law, it is sufficient to sustain a claim under city law. NYCHRL hostile work environment claims do not require the conduct to be "objectively severe or pervasive," but simply more than "petty slights and trivial inconveniences." The case is analogous to *Philip v. Gtech Corp.*, No. 14 Civ. 9261, 2016 WL 3959729 (S.D.N.Y. July 20, 2016), in which the court dismissed one plaintiff's race-based hostile work environment claims under federal and state law, but declined to dismiss the parallel claim brought under "the more protective standards of New York City law." *Id.* at *24. In *Phillip*, the relevant plaintiff testified that he heard his supervisor call another employee "a 'lazy nigger'" on one occasion. *Id.* The court concluded that this single incident, combined with other comments heard second-hand, was not sufficient to meet the "severe or pervasive" standard required under Title VII and NYHRL because it constituted an "isolated, sporadic, and de-personalized epithet[]." *Id.* However, under NYCHRL, the Court concluded that, "an African-American plaintiff's personal observation of his supervisor using the term 'lazy nigger'—combined with other, secondhand evidence of racial bias—is sufficient for a reasonable jury to conclude that the plaintiff was subjected to more than mere 'petty slights or trivial inconveniences.'" *Id.* at *25.

Here, Plaintiff testified that her supervisor called her a "dyke," disparagingly called her work "gay," and referred to another individual as a "faggot." She also heard second-hand that he called his own supervisor a "faggot." These incidents, although too isolated to meet the "severe or pervasive" standard required by NYHRL, are more than "petty slights or trivial inconveniences," and therefore can sustain a claim under NYCHRL.

41

Accordingly, Defendant's motion for summary judgment dismissing Plaintiff's sexual-orientation hostile work environment claims is GRANTED as to her claim under NYHRL and DENIED as to her claim under NYCHRL.

## V.     Plaintiff's Equal Pay Claims

Counts Four and Five of the amended complaint assert violations of the EPA and NYEPA, respectively. Defendant has moved for summary judgment dismissing both claims, and Plaintiff has cross-moved for partial summary judgment of liability in her favor on both claims. Plaintiff's motion does not address damages or whether Defendant's violation of either statute was willful.

Under the EPA, a plaintiff must show that (1) the employer paid different wages to employees of the opposite sex; (2) the employees performed equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs were performed under similar working conditions. *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001); *see* 29 U.S.C. § 206(d)(1). If the plaintiff is able to make this prima facie showing, the burden shifts to the employer to establish an affirmative defense by proving that the pay differential is based on: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 570 (S.D.N.Y. 2012), *aff'd*, 526 F. App'x 124 (2d Cir. 2013) (quoting 29 U.S.C. § 206(d)(1)). An equal pay claim under the NYEPA is analyzed under the same standards. *See Kent v. Papert Companies, Inc.*, 309 A.D.2d 234, 246 (2003). However, claims under NYEPA are subject to a six-year statute of limitations, rather than the two years applicable under the EPA absent a showing of willfulness. *Patrowich v. Chem. Bank*, 98 A.D.2d 318, 325 (1st Dep't), *aff'd*, 63 N.Y.2d 541 (1984); *see also Ebbert v. Nassau Cty.*, No. CV 05-5445, 2011 WL 6826121, at *3 (E.D.N.Y. Dec. 22, 2011).

"The Equal Pay Act and Title VII must be construed in harmony, particularly where claims made under the two statutes arise out of the same discriminatory pay policies." *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 483 (2d Cir. 2001). However, the two statutes have key differences. Most notably, "a Title VII disparate treatment claim requires a showing of discriminatory intent, while an Equal Pay Act claim does not." *Id.* While an EPA claim does not require a showing of intent, an EPA plaintiff may obtain damages for up to three years of back pay if she can demonstrate that the EPA violation was willful, as compared to two years' back pay without such a showing. Nonetheless, a showing of discriminatory intent under Title VII should not be equated to a showing of willfulness under the EPA. *See id.*

Here, there are outstanding questions of fact regarding both Plaintiff's prima facie case and Defendant's affirmative defense.

First, Plaintiff and Defendant disagree about which employees are proper comparators to Plaintiff for purposes of evaluating her prima facie case. Defendant argues that all of the male imaging producers in the department should be used as comparators, except for AJ Allen Dexter and Jerry Rohira, because they held the position of "Creative Director" at different times during the limitations period, which Defendant asserts is not a position of "equal skill, effort, and responsibility" to Plaintiff's job. Plaintiff presents two arguments: first, that all female producers hired in 2001 were paid less than all male producers in the department that year, and that this pay differential was never corrected; second, that Plaintiff's closest comparator, Yankowski, was paid significantly more than Plaintiff each year.

It should be noted at the outset that Defendant is correct that Plaintiff cannot recover any damages for "salary differentials outside the limitations period," that is, prior to 2006. *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 119 (2d Cir. 1997). However, as Judge Griesa noted

43

in a previous order in this case, Plaintiff can use evidence from outside the limitations period to

establish that a sex-based pay differential that began prior to 2006 was never corrected and thus

continued into the limitations period. (*See* Dkt. No. 34.)

As to whether the proper comparators are all of the department's male imaging producers

or only a subset of them, the Court is reminded of the admonition that "questions regarding the

equivalence of two positions pursuant to an EPA claim are best left to the trier of fact." *Jamilik v.*

*Yale Univ.*, 362 F. App'x 148, 150 (2d Cir. 2009). There is some evidence in the record

indicating that all of Defendant's music imaging producers performed jobs requiring "equal skill,

effort, and responsibility." (*See* Def's 56.1 ¶¶ 12-25 (describing roles and responsibilities of all

imaging producers as equivalent).) Each producer is assigned to work on multiple channels, and

each is responsible for creating similar forms of audio content. (*Id.* ¶¶ 14-15.)

However, from 2004 until 2011, Plaintiff served as Night Manager, a position that she

described as having additional managerial responsibilities supervising the producers who worked

the night shift, "oversee[ing] the quality of their work" to ensure that "it was technically correct."

(DeLuca Dep. Tr. at 142:18-143:07.) This supervisory position may make her more comparable

to Bryan Apple, who served as Day Manager from 2006 to 2010, than to other imaging

producers. In addition, Plaintiff received a ten percent salary increase ($5,500 annually) in 2001

to account for working the night shift, suggesting that day shift and night shift producers may not

work under comparable working conditions.

Second, regardless of which group of imaging producers are used as comparators, there is

evidence that male producers were paid more than Plaintiff during the limitations period,

although by how much varies depending on the group. As discussed, Yankowski earned several

thousand dollars more than Plaintiff every year between 2006 and 2016, and by 2016,

44

Yankowski was paid $42,440 more than Plaintiff in annual salary and bonuses. If all male imaging producers in the department are used as comparators, Plaintiff's compensation was well below average every year from 2008 onward. If Apple is used as the sole comparator from 2006 through 2010, the pay differential is more than $50,000 per year.

Plaintiff has, therefore, raised genuine questions of material fact regarding each element of her prima facie case.

Outstanding factual questions exist as to Defendant's affirmative defense as well. Defendant argues that the undisputed record shows that any pay differential between Plaintiff and its male employees is based on factors other than sex – specifically, her performance. However, as with Plaintiff's gender discrimination claims, the record regarding Plaintiff's work performance is mixed. As discussed above, during the only years where Plaintiff received a numerical evaluation of her performance, 2002 through 2008, she had, on average, stronger scores than Yankowski. However, she also had narrative evaluations that relay a less conclusive impression of her work. Other factors relating to Plaintiff's performance are partly or wholly subjective, making disposition of Plaintiff's EPA and NYEPA claims on summary judgment inappropriate. *See, e.g., Borrero v. Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 440 (S.D.N.Y. 2008).

Accordingly, both Plaintiff's and Defendant's motions for summary judgment on Counts Four and Five of the amended complaint are DENIED.

## VI.    Plaintiff's Retaliation Claims

Counts Six, Seven, Eight, and Nine of the amended complaint allege claims of retaliation in violation of Title VII, NYCHRL, NYHRL, and NYLL, respectively.

Title VII makes it unlawful for an employer to "discriminate against any individual . . . because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or

45

because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Similar prohibitions are found in NYHRL, NYLL, and NYCHRL. *See* N.Y. Exec. Law § 296(1)(e); N.Y. Labor Law § 215(1)(a); N.Y.C. Code § 8-107(7).

Retaliation claims brought under Title VII, NYHRL, NYCHRL, and NYLL are generally governed by the same *McDonnell Douglas* burden-shifting framework as discrimination claims. *See Dunaway v. MPCC Corp.*, 669 F. App'x 21, 23 (2d Cir. 2016); *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 651 (S.D.N.Y. 2015). "To establish a *prima facie* case of retaliation, an employee must show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir. 1995)), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

What qualifies as an "adverse employment action" for purposes of retaliation claims under federal and state law is broader than what is required for discrimination claims brought under the same statutes. *Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.*, No. 16 Civ. 4897, 2017 WL 2258374, at *10 (S.D.N.Y. May 22, 2017), *report and recommendation adopted*, No. 16 Civ. 4897, 2017 WL 2709747 (S.D.N.Y. June 22, 2017). As the Supreme Court explained in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006), the anti-retaliation provision of Title VII "is not limited to discriminatory actions that affect the terms and conditions of employment." Instead, "to prevail on a claim for retaliation under Title VII, 'a plaintiff must show that a reasonable employee would have found the challenged action

46

materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *White*, 548 U.S. at 60). State-law retaliation claims are analyzed under identical standards. *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 410 (2d Cir. 2011) (NYHRL); *Bright-Asante v. Saks & Co., Inc.*, No. 15 Civ. 5876, 2017 WL 1064890, at *10 (S.D.N.Y. Mar. 16, 2017) (NYLL).

Under NYCHRL, "the plaintiff need not prove any 'adverse' employment action; instead, he must prove that something happened 'that would be reasonably likely to deter a person from engaging in protected activity.'" *Jimenez v. City of New York*, 605 F. Supp. 2d 485, 528 (S.D.N.Y. 2009) (quoting N.Y.C. Admin. Code § 8-107(7)).

If a prima facie case is established, the defendant bears the burden of articulating a legitimate, non-retaliatory reason for its actions. If it does so, the plaintiff must then produce evidence that the non-retaliatory reason "is a mere pretext for retaliation." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

The standards governing the final step of this analysis differ under the various statutes. Under federal and state law, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," not just a motivating factor. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). Under NYCHRL, a plaintiff may rebut a defendant's proffered non-discriminatory reason merely "by producing evidence that the reasons put forth by the defendant were merely a pretext, or show[ing] that, regardless of any legitimate motivations the defendant may have had, the defendant was motivated at least in part by an impermissible motive." *Brightman v. Prison Health Serv., Inc.*, 108 A.D.3d 739 (2d Dep't 2013).

47

Here, Plaintiff makes two distinct retaliation claims. First, she asserts that, beginning in 2008 and 2009, her channels began to be reassigned, her pay was frozen, and she was denied a requested transfer to the day shift in retaliation for complaining about the disparity between her compensation and that of her male coworkers. Second, she asserts that she was assigned to work on the Zakk Wylde roast and denied a transfer to the Talk Department in retaliation for filing her complaint with the NYDHR.

Defendant argues that these actions allegedly taken in retaliation do not qualify as "employment action[s] disadvantaging the plaintiff," sufficient to sustain her retaliation claims. As already discussed, Plaintiff has raised material questions of fact regarding whether her claims of channel reassignment and unequal pay affected the terms and conditions of her employment, so she has necessarily satisfied the broader standard that a "reasonable employee would have found the challenged action materially adverse."

However, no reasonable jury could find that Plaintiff's "denial" of a transfer to the day shift could have remotely deterred or dissuaded a reasonable employee from engaging in a protected activity. As previously discussed, Plaintiff was offered the opportunity to move to the day shift and voluntarily declined to accept it for unrelated reasons. This does not qualify as an adverse action under any law.

The channel reassignment and "pay freeze" allegations bear sufficient temporal proximity to Plaintiff's complaints of pay discrimination to support an inference of retaliation. Although Plaintiff admitted that she had made complaints about her compensation as early as 2005, she testified that, in 2008, she directly asked Todd why she was not being paid commensurate with the male producers she was supervising. She testified that it was in 2008 that Todd replied, "Do you think it's because you're a woman?" (DeLuca Dep. Tr. at 155:11-18.) According to Plaintiff,

it was after that point that she began losing her "creative" channels, starting with BPM. The record evidence indicates that the "freezing" of Plaintiff's salary began sometime between 2008 and February 2009, when Plaintiff was first denied an annual raise, although the size of her bonus had been reduced in previous years.

Whether Defendant's proffered non-discriminatory reason for Plaintiff's compensation and channel assignments – again, her performance – is sufficiently objective to satisfy its burden of production, and, if so, whether Plaintiff can establish that this rationale is merely pretext for discrimination, are both factual questions that must be determined by the jury.

As to the actions allegedly taken in 2012 in retaliation for filing her NYHDR complaint, neither the denial of a transfer to the Talk Department nor the Zakk Wylde roast assignment presents an actionable retaliation claim under either federal, state, or local law.

It is well-settled that denial of a purely lateral transfer – absent any indicia that the desired position was "objectively and materially better than the position [Plaintiff] occupied" – does not qualify as an adverse employment action for purposes of a retaliation claim. *Beyer v. Cty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008). Plaintiff testified that she applied to move to the Talk Department even though she was "not interested" in actually working in that department, solely in order to distance herself from Todd. (*See* DeLuca Opp. Decl. ¶ 108.) Plaintiff has offered no evidence whatsoever to suggest that the Talk Department position was in any way objectively superior to the position she already held, or even that she subjectively viewed the position as superior. On these facts, no reasonable jury could conclude that denial of the transfer was "reasonably likely" to deter Plaintiff from engaging in any protected activity. *See Feliciano v. City of New York*, No. 14 Civ. 6751, 2015 WL 4393163, at *7 (S.D.N.Y. July

15, 2015) (dismissing retaliation claim where the plaintiff did "not provide any information as to how the transfer impacted him").

Although evidence about Plaintiff's assignment to add laughter to the Zakk Wylde roast may be relevant to her claims of hostile work environment, it cannot, standing alone, support a claim of retaliation. The Second Circuit has explained that "purportedly degrading work assignments [that are] within [a plaintiff's] job description" do not qualify as adverse employment actions for purposes of federal or state retaliation claims. *Rodas v. Town of Farmington*, 567 F. App'x 24, 27 (2d Cir. 2014). *See also Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 26 (2d Cir. 2014) (assignment to drive "particularly 'dirty buses,'" along with numerous other actions, could not sustain a retaliation claim). And there is no dispute that the work Plaintiff was assigned to do – improve the sound quality of the recording and increase the volume of the audience's laughter – was within her job description, and that she was given sufficient time to complete the assignment. (*See* DeLuca Dep. Tr. at 303:18-24.) Plaintiff also testified that she was never given a similar assignment again. (*Id.* at 304:14-18.) No reasonable jury could conclude that this single work assignment would be reasonably likely to deter an employee from reporting a claim of discrimination. This action cannot sustain a retaliation claim, even under NYCHRL.

Defendant's motion for summary judgment dismissing Plaintiff's retaliation claims is, accordingly, GRANTED IN PART as to the portions of Plaintiff's retaliation claims related to her 2012 NYDHR complaint and to her allegation that she was denied a transfer to the day shift, and DENIED IN PART as to the remainder of her claims.

## VII.   Plaintiff's Unpaid Overtime Claims

Count Ten and Count Eleven of Plaintiff's amended complaint seek damages under the FLSA and NYLL for unpaid overtime. Plaintiff asserts that she worked an average of 47 hours

per week, despite having a nominal 40-hour work week, and was never paid overtime for these additional hours of work. Defendant argues that Plaintiff is exempt from the protections of the FLSA and NYLL as a "creative professional," and also as an "administrative professional" and, consequently, her overtime claims should be dismissed.

The "creative professional" exemption to the FLSA exempts from the overtime requirements any employee "Compensated on a salary or fee basis at a rate of not less than $455 per week," and whose "primary duty is the performance of work . . . [r]equiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.300(a); see 29 U.S.C. § 213(a)(1). The NYLL contains an analogous exemption for individuals "whose primary duty consists of the performance of work . . . original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination or talent of the employee." N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14(c)(4)(iii).

The "administrative professional" exemption applies to employees who again make more than $455 per week and whose "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and whose "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a); see 29 U.S.C. § 213(a)(1); see also N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14(c)(4)(ii) (establishing similar exemption).

There is no dispute that Plaintiff earned more than $455 per week throughout her time as an imaging producer for Defendant, so she satisfies the salary requirements of both FLSA exemptions.

The more difficult question is whether Plaintiff's "primary duty" meets the requirements of either the creative professional or administrative professional exemption. This is a "highly fact-intensive inquiry that is to be made on a case-by-case basis in light of the totality of the circumstances." *Indergit v. Rite Aid Corp.*, No. 08 Civ. 11364, 2010 WL 1327242, at *5 (S.D.N.Y. Mar. 31, 2010) (internal quotation marks omitted) (quoting *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 290 (E.D.N.Y. 2010)). "Many courts have held that resolving this difficult and intensive factual inquiry is inappropriate at summary judgment." *Id.* at *6.

Plaintiff testified that her position as an imaging producer involves, at least in part, some amount of creativity. (*See* DeLuca Dep. Tr. at 109:2-6.) It is undisputed that an imaging producer's main task is to create audio content like promos and sweepers using sound effects and voice talents. (Pl.'s 56.1 ¶¶ 37-38.) Plaintiff described her job as "creat[ing] the story" based on the instructions given by the programmer in the script. (DeLuca Dep. Tr. at 109:08-11.) There is also evidence in the record suggesting that Plaintiff's work as Night Manager involved the management of other producers and other administrative duties.

However, this minimal information in the record is insufficient to determine, as a matter of law, that Plaintiff falls within either the exemption for creative professionals or administrative professionals. *See, e.g.*, *Magnuson v. Newman*, No. 10 Civ. 6211, 2013 WL 5380387, at *11 (S.D.N.Y. Sept. 25, 2013). It is not clear from the record what amount of Plaintiff's work was truly "original," as she was provided with scripts and instructions on what to create, or whether that work was performed in "a recognized field of artistic endeavor," or whether her work

primarily resulted from her own "invention, imagination or talent." It is also not clear whether her work as Night Manager "directly related to the management or general business operations" of Defendant.

Defendant points to no case in which a radio producer has been held to fall within either of these exemptions. Instead, they cite only to *Freeman v. Nat'l Broad. Co.*, 80 F.3d 78, 87 (2d Cir. 1996), in which the Second Circuit concluded that writers and producers in the field of broadcast journalism fall into the creative professional exemption. But that case was based on regulations that were repealed in 2004, *see Kadden v. VisuaLex, LLC*, 910 F. Supp. 2d 523, 539 n.134 (S.D.N.Y. 2012) (acknowledging repeal), and also involved "'writers and producers at the pinnacle of accomplishment and prestige in broadcast journalism,' whose talents far surpass those of journalists who work for local newspapers or smaller television stations." *Freeman*, 80 F.3d at 86 (quoting *Freeman v. Nat'l Broad. Co.*, 846 F. Supp. 1109, 1123 (S.D.N.Y. 1993)). It is not clear, based on the present record, whether Plaintiff's duties required a level of creativity and talent commensurate with that of the plaintiffs in *Freeman*.

Simply put, the question of what exactly Plaintiff's "primary dut[ies]" are is a question of fact that must be determined at trial by the jury. "[W]hether those activities exempt [her] from the FLSA is [a question] of law" that will be determined by the Court. *Chenensky v. New York Life Ins. Co.*, No. 07 Civ. 11504, 2010 WL 2710586, at *2 (S.D.N.Y. June 24, 2010). Defendant's motion for summary judgment dismissing Counts Ten and Eleven is, accordingly, DENIED.

## VIII.  Damages

Finally, Defendant seeks to prevent Plaintiff from recovering cumulative liquidated damages under the FLSA and NYLL for what it asserts are overlapping unpaid overtime claims,

and seeks to prevent Plaintiff from recovering punitive damages for her Title VII and NYCHRL claims.

Defendant is quite correct that Plaintiff is not entitled to double recovery of liquidated damages under both the FLSA and NYLL. The two laws' liquidated damages provisions, following recent amendments to the NYLL, "are identical in all material respects, serve the same functions, and redress the same injuries," making a cumulative award under both statutes inappropriate. *Chowdhury v. Hamza Express Food Corp.*, 666 F. App'x 59, 61 (2d Cir. 2016). However, as there has been no award of damages – liquidated or otherwise – in this case, Defendant's motion on this point is premature, and is, therefore, DENIED. The court will take care to instruct the jury not to award double damages.

Defendant's motion to preclude Plaintiff's recovery of punitive damages under Title VII and NYCHRL is also premature and therefore DENIED. I will decide at the conclusion of trial whether to charge the jury on this extraordinary remedy. *Doe v. Montefiore Med. Ctr.*, No. 12 Civ. 686, 2013 WL 624688, at *7 (S.D.N.Y. Feb. 19, 2013), *aff'd*, 598 F. App'x 42 (2d Cir. 2015).

### Conclusion

For the foregoing reasons, Defendant's motion for summary judgment dismissing the amended complaint (Dkt. No. 45) is GRANTED IN PART solely as to the elements of Plaintiff's claims arising from her request to transfer to the day shift, as to her sexual-orientation discrimination claims, as to her sexual-orientation hostile work environment claims under NYHRL, and as to her retaliation claims arising from her 2012 NYDHR complaint. It is DENIED in all other respects. Plaintiff's motion for partial summary judgment of liability on her equal pay claims (Dkt. No. 51) is DENIED.

The parties are directed to confer and submit a joint pretrial order in compliance with the Court's Individual Rules no later than sixty days after entry of this decision.

The Clerk of the Court is directed to remove Dkt. Nos. 45 and 51 from the Court's list of pending motions.

Dated: August 7, 2017

_____
Chief Judge

BY ECF TO ALL COUNSEL